**Ralph L. STEWART, Appellant,**

v.

**FRIONA STATE BANK et al., Appellees.**

No. 6487.

Court of Civil Appeals of Texas.

Amarillo.

April 4, 1955.

Rehearing Denied May 2, 1955.

W. T. Link, Clarendon, for appellant.

Aldridge & Aldridge, Farwell, for appellees.

MARTIN, Justice.

This opinion, originally conceived as a dissenting opinion, has been adopted by Associate Justice, E. O. Northcutt, and is rendered as the majority opinion of this Court. Appellant, Ralph L. Stewart, sought to recover funds of his deceased wife on deposit in the Friona State Bank. She had died intestate leaving appellant as her sole surviving heir. Appellees, Aubrey Carlton, Robert Carlton and Wilburn Carlton, are the brothers of appellant's deceased wife and sought to recover such funds from their deceased sister's estate solely by reason of the written contract here in issue and copied in full in this opinion. The sole issue in this cause of action is whether the contract is supported by any consideration. The cause was submitted to the court, and this issue was immediately recognized by the trial court upon his hearing a brief recitation of the facts by the attorneys as evidenced by the court's statement as follows:

"The question, then, in my mind, is what would be the consideration for the contract?"

The issue as to whether the contract is supported by any consideration is wholly dependent upon whether there existed a bona fide dispute between appellant and appellees, as to the facts governing descent and distribution as to the estate of appellant's deceased wife. Since there is a wide divergence of opinion in the Court as to both the law and the facts in the cause, the controlling issue will be discussed in detail as to both the facts and law. The amount of money involved is not large as the trial court awarded each of the appellees the sum of only $461.56. The case is rather a test of the rights of the parties and of the soundness of judicial procedure than of the value of the recovery.

Appellant, Ralph L. Stewart, was married to Johnnie Opal Carlton Stewart for approximately nine years. During this time she had suffered from spells of mental illness and appellant had placed her in a hospital for treatment—about 12 or 15 weeks on one occasion. Appellant was a railroad telegrapher and he and his wife had accumulated a small estate consisting principally of money in the bank. Appellee, Aubrey Carlton, is a brother of Johnnie Opal Carlton Stewart and testified that his sister had written to another brother asking such brother to come for her at Jayton. Appellee, Aubrey Carlton, testified he moved his sister to Friona and that he did not advise appellant of the impending trip prior to arriving in Jayton where his sister and appellant resided. Appellant testified that Aubrey Carlton requested a division of the community property owned by appellant and his wife at the time of this separation. Appellant, in a settlement with his wife of their community property interests, delivered to her the sum of approximately $3,000. Aubrey Carlton then accompanied his sister to Friona where the money was deposited in the Friona State Bank. Appellant's deceased wife lived with her brother, Aubrey Carlton, approximately 27 days following this separation from her husband and before taking her life. She and her husband were never divorced and neither party had filed suit for divorce.

Following the death of appellant's wife, appellant and his deceased wife's three brothers, appellees herein, under the cir-

cumstances hereinafter detailed, executed the following written contract:

The State of Texas)
County of Parmer)

Whereas Johnnie Opal Carlton Stewart, of Friona, Texas, departed this life April 30, 1953, intestate, and left surviving her no child either adopted or otherwise, and left no mother and father surviving, but left an estranged husband, Ralph L. Stewart, of Channing, Texas, and Aubrey Carlton, a brother, and Wilburn Carlton, a brother, both of Parmer County, Texas, and Robert Carlton, a brother, of Hedley, Texas, and her entire estate consisted of cash in Friona State Bank, Friona, Texas, of not more than $3,000.00; consequently, no inheritance tax could be owed to the State of Texas and no estate tax could be owed to the United States Government.

Whereas, a bona fide dispute exists as to the facts governing the descent and distribution of this property and the parties being desirous of settling such estate amicably, and as inexpensively as possible, agree that the only debts owed by the said Johnnie Opal Carlton Stewart are as follows:

Wolf-Roberts Funeral Home, Clovis, New Mexico $ 942.00
Parmer County Community Hospital, Friona, Texas $ 7.00
Dr. Paul L. Spring, Friona, Texas $ 3.00

and each party signing this contract guarantees and warrants to said bank that such indebtedness is all the indebtedness owed by the estate of the deceased.

Therefore, the Parties hereto bind and obligate themselves to said bank that they are the sole and only heirs-at-law of the deceased and agree to hold said bank harmless for any distribution made of said fund in keeping with this agreement and, as stated above in compromise, satisfaction and accord, and for the purpose of settling a dispute which is agreed to be bona fide the undersigned parties instruct Friona State Bank to pay the indebtedness above described out of the bank account of the deceased including a fee to the attorney for drafting this instrument and counseling them in regard to the settlement and the remainder to be paid as follows:

¼ to Ralph L. Stewart, surviving husband;
¼ to Aubrey Carlton, surviving brother;
¼ to Wilburn Carlton, surviving brother;
¼ to Robert Carlton, surviving brother.
Witness Our Hands this 4th day of May, A. D., 1953.

(signed and acknowledged by appellant and appellees)

A short time after the execution of this contract, appellant contacted an attorney and directed the Friona State Bank not to pay out any funds thereunder. Appellant, as the sole surviving heir of his deceased wife, then filed suit for the funds in the bank. As the sole surviving heir of his deceased wife, his claim to such fund was a liquidated demand. Appellees answered claiming ¾ of the fund by reason of the above-written contract. The Friona State Bank filed an answer stating that the bank held the funds and would pay the same over to the party entitled thereto.

■ As indicated at the inception of this opinion, the written contract detailed in the above paragraph must be supported by a valid consideration. The only consideration upon which the contract can rest was recognized by the appellees' attorney in preparing the contract, "Whereas, a bona fide dispute exists as to the facts governing the descent and distribution of this property, * * *". There is no need to go beyond the written contract itself to ascertain that the same is wholly without any consideration. The opening paragraph of the contract in reciting the undisputed facts of heirship reveals beyond controversy that there was, and could be, no bona fide dispute as to the facts governing descent and distribution. Further, the contract in the first paragraph thereof does not allege that the facts as to descent and distribution as recited therein were agreed upon as a result of a bona fide dispute as to the facts surrounding the same. The contract merely recites the existing facts governing the issue of heirship under the statutes of descent and distribution. When the statutes

of descent and distribution are applied to the undisputed facts recited in the contract, appellant must be recognized as the sole heir to his wife's estate and as the sole person entitled to the funds in the Friona State Bank. Therefore, the contract itself fully determines the facts as to the issue of consideration and reveals that the contract under which appellees must recover is wholly without any consideration and is unenforceable.

The trial court, by detailed findings of fact in his judgment, enumerated several issues which were incorporated in the judgment for the evident purpose of showing a bona fide dispute existed between the parties and that thereby the contract was founded upon a consideration. The record will be examined in detail—first on the issue as to whether there was a bona fide dispute as to the facts of descent and distribution and second as to whether there is any evidence supporting the findings in the trial court's judgment. Appellant's second and third points of error allege that the testimony is undisputed as to the lack of consideration and thereby raise the issue that there was no evidence of the existence of a bona fide dispute between the parties as found by the court as the basis for his judgment.

The record will be examined first on the issue of whether there existed a bona fide dispute between the parties as to the facts governing descent and distribution of the fund in issue—the consideration appellees sought to establish as to the contract. The good faith and soundness of appellees' contention may be ascertained from an examination of the conduct of Aubrey Carlton in procuring appellant's signature on the contract as revealed by the following excerpts from his testimony. Aubrey Carlton's testimony will be principally discussed herein as he was the agent of his brothers in drawing the contract and was the sole actor in procuring appellant to execute the same. The testimony of Aubrey Carlton, although cut off by proper objection at its inception, finally revealed that his brother Robert told him, following their sister's funeral at Turkey, that appel-

lant was willing to pay the debts and divide the money in issue four ways. The record does not reveal whether Aubrey Carlton was present at the time this alleged statement was made by appellant to his brother Robert. Appellant denied making the statement as to offering to divide the money four ways and is fully corroborated in this by the testimony of appellee, Robert Carlton, as pointed out hereinafter. As to any conversations between appellant and Aubrey Carlton, Aubrey Carlton's testimony reveals only one conversation between appellant and Aubrey Carlton and such conversation was at the Friona State Bank just before the contract was signed. It is undisputed that Aubrey Carlton only saw appellant twice before the contract was signed—at the funeral and in Friona when the contract was executed. In the light of this undisputed fact, there are some unusual elements as to Aubrey Carlton's testimony concerning his conversation with appellant in Friona when examined in the light of whether the record reveals any evidence of a bona fide dispute.

Aubrey Carlton, according to his own testimony, following his learning of the alleged statement made by appellee to Robert Carlton as to what disposition appellant wanted to make of the money in the bank, engaged the services of an attorney in Farwell, Texas. His testimony reveals that he gave such attorney all the facts as recited in the first paragraph of the contract herein quoted and had him prepare such contract. Page 39 of the statement of facts reveals that Aubrey Carlton admitted on cross-examination that he had already employed this attorney to prepare the agreement in issue and the same had been written before he made a long-distance call to appellant, Ralph L. Stewart, asking him to come to Friona. Aubrey Carlton further admitted that Ralph Stewart had never seen the agreement or knew of it being prepared until he saw it at the bank in Friona when it was signed by appellant. The following testimony clearly reveals this issue,

"Q. Well,—and as far as you know, Ralph Stewart knew nothing about the agreement you had written up until

you showed it to him there at the bank in Friona, that is correct, isn't it? You can answer that yes or no. A. Yes."

This clear cut admission by Aubrey Carlton reveals that he had already drawn the agreement in issue, without any authority from or knowledge of the appellant, and had deposited the same in the bank at Friona ready to be signed. In the light of this proven fact, pages 23 and 24 of the statement of facts reveal the following statement of appellee, Aubrey Carlton, as made to the appellant in Friona just prior to the signing of the written contract:

"Q. What four ways was the money to be divided? A. Between Ralph Stewart, myself, my brother Robert Carlton any my brother Wilburn.

"Q. What did you tell him about that? A. *Well, I told him that it was all new to me, I hadn't had time to study it and hadn't thought about that part,* but if it was agreeable with the other three, well, it would sure be with me, and I would go along with whatever the others decided." (*underscoring* added.)

Aubrey Carlton further testified they signed the contract following this conversation. As to the controlling issue of whether there existed between the parties any bona fide dispute as to the facts, or any dispute at all, appellee, Aubrey Carlton, further testified:

"Q. Did Ralph Stewart make any objection to that kind of an agreement? A. He didn't."

The above undisputed testimony and admissions of Aubrey Carlton should be all the evidence needed by a court to take the true measure of this cause of action and to ascertain that there existed no bona fied dispute as to the facts of descent and distribution—the stated consideration upon which the contract is based. Aubrey Carlton testified under oath that appellant made no objection to that kind of an agreement. He further testified under oath in answer to direct examination by his own attorney as to his reason for executing the contract:

"I just wanted to cooperate."
Therefore, the court is left with only two elements of testimony to establish the alleged bona fide dispute, if Aubrey Carlton's testimony is accepted as correct, to-wit:

"(1) that appellant, immediately following his wife's funeral, stated he was willing to pay the expenses and settle four ways and made no objection to the agreement as signed, and

(2) Aubrey Carlton was willing to settle because he wanted to co-operate."

This, and the preceding paragraph, constitute a brief survey of the controlling evidence as to the conduct of the parties just prior to the execution of the contract with reference to the issue of a bona fide dispute—the appellant had no objection to the contract and Aubrey Carlton, representing appellees, wanted to co-operate. This testimony reveals no evidence of any bona fide dispute as to either the facts or the law.

The findings of fact in the judgment will next be examined on this issue. The judgment in the cause recites numerous findings of fact as a basis for sustaining the contract in issue. These findings of fact seek to establish the existence of a bona fide dispute between the parties and thereby constitute a finding that the contract in issue is supported by consideration. Appellant's points two and three assert, in essence, that "the undisputed testimony showed such agreement without any consideration and utterly void." Therefore, the findings of fact in the judgment seeking to establish the existence of bona fide disputes as forming the consideration for the contract in issue must be examined in the light of appellant's points of error. The respective findings of the trial court and the evidence thereunder will be briefly discussed in separate paragraphs.

▪ The trial court first found that "there was a bona fide dispute between

Aubrey Carlton and Ralph Stewart as to whether or not Aubrey Carlton should be reimbursed for the care and expenditures which he had rendered to and made in behalf of the deceased, Johnnie Opal Carlton, and also for moneys he had expended in connection with her burial out of the estate of the said Johnnie Opal Carlton Stewart." There is not a scintilla of testimony that Aubrey Carlton ever made any claim for such expenditures. His testimony is to the effect that on the day of the funeral appellant was willing to pay the expenses and divide the money four ways. Aubrey Carlton, as pointed out hereinabove, had his attorney prepare the contract in issue without appellant's authority or even knowledge of the act but it is noteworthy that Aubrey Carlton did not place in the contract any debt due him but recited only the funeral expenses and one or two minor debts which were to be paid out of the funds in his deceased sister's estate. In the preparation of this contract, he had a free hand, according to his own testimony, but he did not assert any claim against his deceased sister's estate whatsoever. It is wholly contrary to human experience to even presume that Aubrey Carlton had a financial claim against his deceased sister for the 27 days she was in his home under the circumstances revealed by this record.

The court next found "That the said Aubrey Carlton, Wilburn Carlton and Robert Carlton had a doubtful claim against the estate of Johnnie Opal Carlton Stewart. That there was a doubt both as to the facts and as to the law." It is true that Aubrey Carlton went to Jayton, Texas and brought his sister to his home but he only kept her there approximately 27 days before she took her life. He never at any time asserted any claim due him for going to Jayton for his sister and moving her to his home. He voluntarily paid the funeral expenses but there were ample funds in the bank to the credit of the deceased to pay such expenses and final payment of all expenses was made from the deceased's estate without any controversy as to the same. As to the other two brothers, their sister had

not been in the home of one of them and had only paid a short visit to the other. It cannot be reasonably assumed that she owed the one brother anything by reason of this short visit—at least no claim was made for the same. All three brothers signed the agreement here in issue as dictated by their agent without ever asserting they had a doubtful claim or otherwise. A recitation of the debts as prepared by Aubrey Carlton's attorney upon the advice of Aubrey Carlton acting for himself and as agent for his brothers did not reveal any debt owing any of the appellees. As to the doubt as to both the facts and law, both Aubrey Carlton and Robert Carlton testified, without any dispute, as to the family history as detailed by Aubrey Carlton and as incorporated in the written agreement. There is not a scintilla of testimony in the record that any doubt existed in the mind of any party to the contract as to the facts recited in the contract. As to the court's allegation of "doubt as to the law," the attorney for appellees completely foreclosed this issue as a basis for any dispute as consideration for the contract by the following question:

"The only thing you mean to tell the court was that *you didn't know the law,* also, that's right, isn't it? A. Yes, sir.

"Q. But in this agreement, you didn't say anything about a dispute as to the law, *you said there was a dispute as to the facts,* didn't you, isn't that right? Right here, 'whereas a bona fide dispute exists as to the facts governing the descent and distribution of this property,' isn't that right, *you didn't say there was a dispute as to the law, did you?* A. *No." (Underscoring* added.)

The court also found, "That at the time of the settlement hereinafter referred to was entered into, it was not known whether Johnnie Opal Carlton Stewart died testate or intestate and it was not known by any of the parties hereto what the terms of her will, if any, were." There is not a scintilla of evidence to support this finding. Further, to arrive at such finding, the final

positive testimony of appellees, Aubrey Carlton and Robert Carlton, that there was no will must be cast out and discarded. Further, reference is again made to the fact that Aubrey Carlton had his attorney prepare the contract without any authority from appellant and without appellant's knowledge of such preparation. Aubrey Carlton, prior to the drawing of the contract and to its execution, advised his own attorney that his deceased sister had no will. This phase of the testimony was fully developed by appellant's attorney and need not be further discussed as Aubrey Carlton, acting for himself and as agent for his brothers, was certainly bound by his statement to his attorney that their sister died intestate. The court's finding is directly contrary to the statement of facts as to heirship as included in the contract as well as to the testimony and statements of both Aubrey Carlton and Robert Carlton. Further, as pointed out at the time of submission on oral argument, the appellees cannot legally draw the presumption, without any evidence as a basis therefor, that appellant presumed there was a will. They certainly cannot then further presume thereon that appellant further presumed that the will, if existing, eliminated him as an heir and thereupon further presumed from such presumption that he had better settle as to his deceased wife's estate. This finding of the court also wholly disregards the fact of the deceased's mental condition and as to her capacity to execute a will. Such involved and theoretical speculation and presumption based upon presumption cannot support a judgment or finding of fact which is directly contrary to the testimony of the deceased's own brothers that she had no will and that they were unable to find a will.

The trial court further stated in his judgment, "That there was a disputed claim and a doubt among the parties as to what the law applicable in such cases would be * * *" Such disputed claim and a doubt as to what the law applicable in such cases would be was foreclosed not only by the statement which Aubrey Carlton had his attorney place in the contract as to the

nature of the alleged bona fide dispute but by the specific examination of Aubrey Carlton by his attorney on this issue as disclosed hereinabove wherein any issue as to a dispute on the law was eliminated by the direct testimony of Aubrey Carlton.

In examining the record in the light of the above findings of the court, it is recognized that Aubrey Carlton, on being first examined by his attorney, attempted to testify that he did not know whether or not his sister had a will but this testimony is directly contra to the prior information given in private by appellee to his attorney as a basis for preparation of the contract. But, "the facts governing the descent and distribution" were established beyond controversy by the testimony of both Aubrey Carlton and Robert Carlton in the trial of the case—which testimony established, without dispute, the facts as recited in the first paragraph of the contract here in issue. This issue was fully clarified by the testimony of Aubrey Carlton:

"Q. Now, Mr. Aldridge asked you a question as to a dispute to the laws of descent and distribution. Now, this contract doesn't say anything about a dispute as to the law of descent and distribution, it says that there is a dispute as to the facts, didn't I read that correctly? A. That's right.

"Q. Now, there wasn't any dispute about the facts of descent and distribution, you knew, as a matter of fact, that the Plaintiff, Ralph L. Stewart, was the husband of your sister when she died, you knew that, didn't you? A. Yes.

"Q. You knew they weren't divorced? A. That's right.

"Q. You knew there was no children, either natural or adopted? A. Yes.

"Q. And you knew or stated in here that she died without any will? A. Yes, to my knowledge.

"Q. Then you stated that then and you state today that she died without

any will, as far as you know? A. That's right.

"Q. Then there couldn't be any dispute as to that fact. You knew who her husband was, and who her brothers were, and that she had no father or mother and she had no will, you knew all those things, didn't you? A. Yes."

Aubrey Carlton, on re-direct examination by his own attorney testified to the same facts and specifically as to the issue of the non-existence of a will,

"Q. And you knew she had no will, so you did know the facts then as well as you know the facts now, didn't you? A. Yes, sir."

The above-admitted facts, under the statutes of descent and distribution, foreclosed any issue as to the legal ownership of the fund in the bank in Friona and established the appellant as the owner thereof. They likewise revealed the total absence of a bona fide dispute of any nature as to the fund in issue and established that the contract in issue was wholly without any consideration.

As stated hereinabove, Aubrey Carlton attempted to testify that the appellant had told his brother, Robert Carlton, immediately following the burial of appellant's wife, that he wanted to settle "this case"? Immediately following the burial of appellant's wife, there was no "case" filed and none to be settled just as there was no "case" filed or to be settled at any time prior to the signing of the contract. On this issue as to what appellant told Robert Carlton following the burial of his wife, appellant testified that he had told Robert Carlton that he wanted to pay the funeral expenses. Appellant denied that he propositioned Robert Carlton to divide this money four ways. On this issue and conversation, appellee, Robert Carlton, testified on direct examination by his own attorney as follows:

"Q. The day of the funeral. All right, now, tell the court *just exactly what he said to you.* A. *He said he wanted to settle it and get it over* with and pay the bills, and *I agreed* to settle it four ways.

"Q. All right, *what did he say?* A. *He just said he would like to settle it and get it over with.*

"Q. How did he want to settle it? A. Divide it four ways after the expenses.

"Q. All right, *tell us what he said.* A. *He just said he would like to get the thing settled.*

"Q. That was the day they buried your sister. A. That's right, after the funeral.

"Q. All right, *what did he say—* how did he say he wanted to settle it? A. Settle it four ways after the expenses were paid."

It is noteworthy that Robert Carlton never testified as *to what the appellant said* in this conversation had with Robert Carlton within an hour or two after they had buried appellant's wife—the sister of the appellees. Robert Carlton's testimony, in the absence of repeated leading questions, fully corroborated appellant as to his testimony as to what he said on the day of the funeral. It would not be material in the cause as to the issue of consideration had appellant stated that he was willing to divide the money four ways but this issue is clarified as it reveals appellant said nothing to induce Aubrey Carlton to prepare the written contract. On such issue, Aubrey Carlton testified he told the appellant, "that he (appellant) was the one that wanted it that way." This was nothing more than a self serving declaration made by Aubrey Carlton and no basis for it is found in the testimony of his brother Robert Carlton as revealed hereinabove.

■ There is no evidence in this record of a bona fide dispute of any nature. After the appellant repudiated the contract and came to Farwell with his attorney and paid the funeral expenses, no bona fide controversy arose even at that late date. The undisputed testimony reveals that Wilburn

and Aubrey Carlton threatened the appellant with personal violence and cursed him at that time but there is no evidence in this record that appellent either said anything or did anything that would transpose appellee's cursing and threats into a bona fide controversy. This occurrence took place following the appellant's repudiation of the contract in issue.

Since there is no evidence in the record to support the consideration on which the written contract is founded in that there is no evidence in this record that "a bona fide dispute exists as to the facts governing the descent and distribution of this property", the contract is unenforceable and void and appellees were not entitled thereunder to recover three-fourths of the estate of appellant's deceased wife. Appellant's right to the money on deposit was a liquidated demand therefor. "We do not understand that an insurance company, by inserting in the settlement agreement a statement that there is a dispute between the parties when there is in fact none, thereby forecloses the issues and puts the matter beyond investigation. 10 Tex. Jur. 119", National Mut. Ben. Ass'n v. Butler, Tex.Civ.App., 72 S.W.2d 659, 661[4]; "'It is well settled, elementary in fact, that an agreement, not supported by a consideration, for a creditor to receive a less sum than the whole, will not discharge the debt.'" McCarty v. Humphrey, Tex.Com. App., 261 S.W. 1015, 1016[1]; "The demand * * * can be calculated upon undisputed factors and is a liquidated demand. * * * 'Sufficient consideration for accord may inhere in or arise out of a dispute as to liability upon a liquidated claim. This presupposes that denial of liability, in whole or in part, is not merely factitious or mala fides.'" Ortiz Oil Co. v. Geyer, 138 Tex. 373, 159 S.W.2d 494, 497[4–6]; The Eastland Court of Civil Appeals speaking through Judge Hickman ruled as follows: "There being no such contract, certainly appellant could not in good faith dispute a claim based thereon. A bona fide claim cannot be based upon a contract which had no existence." Silvers Box Corporation v. Boynton Lumber Co.,

297 S.W. 1059, 1061, writ refused. In the cause here in issue, a bona fide dispute cannot be based upon conversations or disputes which had no existence in fact. "If, when the compromise was made, the facts really existed which rendered the lien void under the Constitution, the parties could not make the lien valid by agreeing that such facts did not exist." In the cause here in issue the appellees cannot supply the consideration for the alleged compromise agreement by agreeing that a bona fide dispute and controversy existed when in fact none existed under the evidence and none could have existed as revealed by the recitation of the facts in the very agreement itself. Rich v. Walker-Smith Co., Tex. Com.App., 57 S.W.2d 1098, 1099; "* * * such dispute must be an honest one and based on some reasonably tenable grounds, though it need not be in fact well founded." Detroit Belt Lacer Co. v. Fowler, Tex.Civ. App., 4 S.W.2d 651, 653; "The compromise of a disputed claim may uphold a promise, although the demand was unfounded. * * * However, if the party knows or ought to know that the claim has no foundation, it is not a consideration". 17 C.J.S., Contracts, § 105, p. 462.

The appellant's three points of error are sustained. The judgment of the trial court is reversed and judgment is rendered for the appellant for the funds in issue.

PITTS, Chief Justice (dissenting).

As I view the matter, the majority opinion is not supported either by the record in this case or the law applicable thereto. Consequently, I must respectfully dissent.

The majority opinion seems to challenge the sufficiency of the evidence and charge in effect that the same does not support the trial court's judgment. Throughout the majority opinion the credibility of certain witnesses are either directly or indirectly challenged.

It is elementary that the trier of facts, and not this Court, has the exclusive function of determining the credibility of the witnesses and the weight to be given their

testimony in a case such as this. Glenn v. Glenn, Tex.Civ.App., 183 S.W.2d 231; Shock v. Mrs. Ragsdale's Foods Co., Tex. Civ.App., 228 S.W.2d 353. More than once, the majority opinion seems to call into question the value, or lack of value, of the testimony of appellees, Aubrey Carlton and Robert Carlton, attempts to show conflicts in each witnesses' testimony, seems to doubt their good faith, attempts to weigh their testimony given and indirectly, if not directly, charges in effect that the evidence was insufficient to support the trial court's judgment. As to the question of insufficiency of the evidence, it has been held that where there is no assignment of error in the Court of Civil Appeals on grounds of insufficiency of evidence to sustain the judgment, the Court of Civil Appeals has no jurisdiction to pass upon such a question. Wisdom v. Smith, 146 Tex. 420, 209 S.W.2d 164. In this case, there is no assignment of error by appellant on the grounds of the insufficiency of the evidence. In his three points of error, appellant contends in effect that he is entitled to all of the money in question because the contract has no consideration and that in any event the contract was a mere promise of appellant to make a gift of money to appellees. At any rate, in examining the evidence to determine its sufficiency, this Court must give credence only to the evidence and circumstances favorable to the findings of the trial court, indulging every legitimate conclusion which tends to support such findings, and disregard all evidence and circumstances to the contrary. Landwer v. Fuller, Tex.Civ.App., 187 S.W. 2d 670; Boston Ins. Co. v. Rainwater, Tex. Civ.App., 197 S.W.2d 118, and other authorities cited by these cases. If no findings are filed (and all the findings revealed by this record are found in the trial court's judgment) it is the duty of this Court to affirm the trial court's judgment if such can be done on any reasonable theory supported by the evidence and authorized by law. Strickland v. Humble Oil & Ref. Co., Tex. Civ.App., 181 S.W.2d 901, and other authorities there cited. When a court of competent jurisdiction has rendered a final

judgment in a civil cause, it must be presumed that the ends of justice have been met through a fair and impartial trial unless a prejudicial error to the contrary has been affirmatively shown. Smothers v. Gawlik, Tex.Civ.App., 214 S.W.2d 894, Bennett v. Jackson, Tex.Civ.App., 172 S. W.2d 395, Erback v. Donald, Tex.Civ.App., 170 S.W.2d 289. In my opinion, appellant has failed in the case at bar to affirmatively show any such prejudicial error. In fact, the contrary is shown by the record, as I view the matter.

The majority opinion seems to raise some question about whose attorney drew the contract, and seems to probably imply that appellant was deceived into signing the contract. The record does not support such apparent implication; it reflects the contrary and especially does appellant's own testimony reflect the contrary. According to the record, no attorney was present when the contract was executed and according to the record the attorney who drew the contract did so under instructions after one of the appellees, according to his testimony, had discussed settlement with appellant, who mentioned the matter soon after the funeral of deceased, and appellant then suggested a four-way division of the money in question. At any rate, after the parties voluntarily executed the contract in the absence of fraud, mistake, misrepresentation or concealment of facts, as was done in this instance according to the record, the contract became theirs and they were bound by its terms regardless of who drew the contract.

The majority opinion likewise asserts that there was no evidence to support a consideration shown in the contract or that there existed a bona fide dispute between the parties. We think the contrary is shown and supported by numerous authorities hereinafter cited.

As I view the matter, this is a suit to determine legal ownership of certain monies on deposit in the Friona State Bank in the name of Johnnie Carlton Stewart, deceased. Appellant, Ralph L. Stewart, the estranged husband of deceased at the time

of her death on April 30, 1953, is now claiming all the money, while appellees, Aubrey Carlton, Wilburn Carlton and Robert Carlton, brothers of the deceased, are claiming a four-way division of the money by reason of the execution of a compromise contract. The bank answered by tendering the money to the court to be paid to the rightful owner or owners as the case may be. The case was tried to the court without a jury. The trial court found in effect that the claims were previously in dispute between the parties who were in doubt both as to the facts and the law governing their respective rights, as a result of which the parties had verbally agreed and then entered into a valid written contract to divide the said monies equally among the four interested parties previously herein named after the payment of just debts, by the terms of which contract they were all bound. It therefore rendered judgment dividing the remainder of the said deposit in the said bank, which sum it found, after the payment of certain debts by agreement of the parties, to be $1,846.24, and appellant and the three-named appellees were each awarded the sum of $461.56.

A brief preliminary statement of facts will help determine the issues raised. Appellant and the deceased had been married approximately nine years before their separation on April 1, 1953, before her death April 30, 1953. Prior to the separation, Mrs. Johnnie Carlton Stewart had been confined to an institution for mental illness. No children had been born to the marriage and this was the only marriage of either party. At the time of the separation, appellant had a personal property settlement with his wife and paid her in checks the total sum of $2,833.25, which sum she deposited in the Friona State Bank in her name. Before her death she checked out a small amount, some of the balance was used after her death to pay her funeral expenses as well as a small drug bill and a small doctor bill by agreement of the parties. The remaining sum is here in controversy. After the separation, Mrs. Johnnie Carlton Stewart lived with her brother,

Aubrey Carlton and his family, until she took her own life on April 30, 1953, and was buried the following day. Aubrey Carlton thereafter filed for an administration upon her estate and such was granted but thereafter dismissed by agreement of the parties. The deceased had both burial insurance and life insurance with appellant named as the beneficiary. The amount is not shown but appellant testified that he collected and kept the proceeds of both, and that Aubrey Carlton himself paid the burial expenses, drug bill and doctor bill in the total sum of $952 when they were due and waited from May until August, 1953, to be reimbursed therefor.

The body of the contract in question has been copied in the majority opinion showing acknowledgments but it does not there show that each of the four parties thereto signed and separately acknowledged they signed the same "for the purposes and consideration therein expressed." Appellees and the bank both pleaded the terms of the contract. Appellant proved the execution of the contract but appellees introduced it in evidence. The entire contract, together with the four acknowledgments thereto, is before us.

In my opinion, the controlling question to be here determined is whether or not the trial court was justified in finding and concluding that the contract in question was valid and binding upon appellant and in basing its judgment primarily thereon. After the contract had been executed, appellant sought to revoke its terms primarily on the grounds that it was without any consideration but appellees would not agree to his attempted revocation.

Appellant testified in effect that he was 42 years of age, had a high school education and was an experienced railroad telegrapher or operator; that after he read and understood the contract, he signed it (S.F. 84); that he read the contract before signing it and signed it in good faith (S.F.82); that he was not afraid of anybody and nobody forced him to sign the contract (S.F. 86); that he later changed his mind about dividing the money in question with the

Carlton Brothers after he talked with his attorney about the matter. In observing the elementary rule of law previously cited to the effect that in considering the trial court's findings only the evidence favorable thereto should be considered and all adverse evidence should be disregarded, it must be presumed that the trial court favorably considered the testimony of Robert Carlton to the effect that appellant proposed to him an early settlement of his deceased wife's estate on the day she was buried on May 1, 1953. He further testified that about two hours after the burial on the said day, appellant proposed to him that the burial expenses and other debts of the deceased be paid out of the funds of the deceased and the remainder of the money in the bank account be equally divided between appellant and the three appellees, brothers of the deceased, and that he (the witness) communicated appellant's said proposal to his brother, Aubrey Carlton, and authorized Aubrey Carlton to represent him in preparing and executing a contract making such a disposition of the said money in the bank. Aubrey Carlton also testified that appellant told him before the contract was executed that he was willing to settle the estate of his deceased wife by first paying the burial and other expenses and then dividing the remainder four ways between them and that a contract was accordingly executed on those exact terms. It likewise appears that appellees as well as appellant signed the contract in good faith. Appellant has not pleaded or sought to prove fraud, accident, mistake, misrepresentation, undue influence, or any kind of compulsion.

Much has been written concerning the validity of contracts such as we have before us.

"It is the policy of the law to discourage litigation; and hence the settlement of controversies by compromise is approved by the courts, being favored both at law and in equity. Contracts of compromise are sustained on the ground that they are not only beneficial in themselves, but conducive to peace and harmony. Consequently, in the case of a right which is doubtful or which is controverted, or where the object is to avoid or settle litigation, a compromise duly executed will be upheld if it appears that the parties have acted in good faith, and there is nothing to show fraud or misrepresentation. 9 Tex.Jur. 335–336, Par. 3, and authorities there cited.

"An agreement entered into upon a supposition of right or of a doubtful right, though it often comes out that the right was on the other side, shall be binding, and the right shall not prevail against the agreement of the parties, for the right must always be on one side or the other, and therefore the compromise of a doubtful right is a sufficient foundation of an agreement * * * It is clear that when parties enter into a compromise or family arrangement in order to avoid litigation, the question as to whether one of the parties is entitled to certain property or not, such compromise will not be set aside, although it should eventually turn out that the party taking something under the compromise was in reality legally entitled to nothing." Camoron v. Thurmond, 56 Tex. 22, 34–35.

There is no question but what this was a compromise agreement, based upon "a supposition of right" or "a doubtful right" in the minds of these ordinary laymen. Such being true, it constitutes "a sufficient foundation of an agreement."

In the case of Taylor v. Taylor, Tex. Civ.App., 54 S.W. 1039, 1049–50, the court cited with approval, quoted from and followed the rule announced in the Camoron v. Thurmond case. The court likewise there stated that:

"The written contracts show an intention to settle all matters of claim set up by the plaintiff; and it is shown that he executed the deed with his eyes open, having knowledge of the facts; that there was no fraud or suppression

of facts in the settlement, nor promise of future change or readjustment of the interests settled."

In the case of O'Fiel v. Janes, Tex. Civ.App., 269 S.W. 1074, 1082, affirmed, Tex.Com.App., 280 S.W. 163, the court held that an instrument in controversy showed a voluntary settlement of the matters in issue, founded upon a valuable consideration and binding upon the parties and cited the Camoron-Thurmond case as one of the authorities in support thereof.

The Camoron v. Thurmond case was likewise cited with approval in the case of J. Kahn & Co. v. Clark, 178 F.2d 111, 114, U.S.Court of Appeals, Fifth Circuit. The court there said in part:

"Where the parties, acting in good faith, settle a controversy, the courts will enforce the compromise without regard to what the result might, or would have been, had the parties chosen to litigate rather than settle."

In the case of Commercial Credit Co. v. Ramsey, Tex.Civ.App., 138 S.W.2d 191, 194, the court held that:

"The law favors compromises and settlements of controversies."

In the case of Allstate Insurance Co. v. Lay, Tex.Civ.App., 265 S.W.2d 203, 207, a situation similar to the one at bar was presented. There the court held that "The 'mutual agreement' for the compromise is itself a valuable consideration and sufficient to support the contract, the consideration being the release of the rights of the parties and the avoidance of the expense and annoyance of a suit. 9 Tex.Jur. 340."

One of the earliest cases to follow these principles was that of Gilliam v. Alford, 69 Tex. 267, 6 S.W. 757, 759. There the court said in part:

"The rule in such cases is that 'voluntary settlements are so favored that if a doubt or dispute exists between parties with respect to their rights, and all have the same knowledge, or means of obtaining knowledge, con-

cerning the circumstances involving those rights, and there is no fraud, misrepresentation, concealment, or other misleading incident, a compromise into which they have voluntarily entered must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision.' 2 Pom.Eq.Jur. § 850".

That case has since been consistently cited with approval as has the Camoron v. Thurmond case. Certainly in the case at bar there was a contract of compromise settlement between the parties, all of whom had the same knowledge or means of obtaining such concerning their respective rights.

In the case of Little v. Allen, 56 Tex. 133, 138, the rights of the parties depended upon the construction and validity of a compromise agreement. Plaintiff contended that there was no consideration to support the agreement but the court there held against such contention and said in part that:

" A mutual agreement for compromise is in itself a valuable consideration."

In support of these rules we likewise cite the cases of Ford v. Glaze, Tex.Civ.App., 60 S.W.2d 898; Kluck v. Spitzer, Tex.Civ. App., 54 S.W.2d 1063; Elliott v. Shaffer, Tex.Civ.App., 41 S.W.2d 686; Von Hatzfeld v. Haubert, Tex.Civ.App., 224 S.W. 220, and other authorities cited in these cases.

Although appellant has not presented any assignment of error to such effect, he seems to contend that there was not any dispute between the parties but the contract itself states in one place that "a bona fide dispute exists." In another place in the contract we find the statement: " * * * for the purpose of settling a dispute which is agreed to be bona fide, the undersigned parties instruct Friona State Bank to pay * * *." Appellant, having voluntarily

signed and acknowledged the contract before a notary containing the language above-quoted, is now estopped from denying the existence of a dispute between the parties in the absence of a claim of fraud, accident, mistake or coercion. In the case of Great Southern Life Ins. Co. v. Heavin, Tex.Com.App., 39 S.W.2d 851, 852, the court held:·

. "A party to a written settlement may not contend that there was no dispute to compromise, when the instrument itself clearly states the grounds for the settlement and he deliberately signs and acknowledges it. Texas Jurisprudence, par. 29, p. 269, and par. 30, p. 271, and authorities there cited."

In 9 Tex.Jur. 344, par. 9, we find this language:

"A party will not be heard to contend that there was no controversy to compromise where it appears that he signed an agreement to compromise and acknowledged it before a notary for registration, and it is not shown that he did not know what he was doing or that any actual fraud or coercion was used or that there was a mutual mistake."·

In the case of Ferguson v. Ragland, Tex. Civ.App., 243 S.W. 721, 723 (writ refused), a party to a written compromise contended thereafter that no dispute existed. While a jury found to the contrary, it was also held that such party had bound himself contrary to his own contentions by signing the compromise agreement. The court there said in part:·

"Appellant on that issue is bound both by the findings of the jury, as well as by his own written declaration. It will be well to remember in such cases the exclamation of old Job, 'O, that mine enemy would write a book!' It is not shown by appellant that he did not know what he was doing or that any actual fraud was committed or mutual mistake made in the agreement, or coercion used to compel him to sign his name thereto, which he deliberately

signed and acknowledged before his lawyer, a notary public * * *."

This authority clearly applies to the undisputed facts presented in this case. We likewise cite the case of Phipps v. American Nat. Ins. Co., Tex.Civ.App., 116 S.W. 2d 800, 803, in support of such rule.

At any rate, the trial court found that a dispute existed or that the parties were at least in doubt about their respective rights, and such finding is supported by the terms of the contract and by oral testimony of probative force also given in support thereof.

The parties asserted in the contract that there were some disputed facts without reciting the nature of all the facts. The record reveals at least some doubtful facts existing as found by the trial court, as well as some doubtful applications of law from the viewpoint of laymen, such as these men are, who were not familiar with the law governing the disposition of an estate such as existed here. The record reveals that Aubrey Carlton drove from his home at Friona, Texas, to Jayton, Texas, (a distance of some 190 miles) to aid his sister, Mrs. Johnnie Carlton Stewart, and assisted her in the property settlement between her and appellant on the day they separated, then he took his sister into his home where she lived with him as a member of the family until her death; that he personally paid the funeral expenses, the doctor bill and drug bill when due in the total sum of $952 and waited three months before he was reimbursed therefor; that appellant told his wife on the day of the separation to seek a divorce from him and that if she did not do so, he would seek a divorce from her; but that no action for a divorce was ever filed by either party in so far as the record reflects. The record further reveals that the parties did not know whether or not the deceased had executed a will or what disposition she had made of her estate therein if she had executed a will. Because of her previous mental illness, they did not know whether or not she had testamentary capacity to execute a will if she had done so. Under the record

here presented, such may have been a controverted issue if she had executed a will. However, these matters being doubtful, the parties recited in the contract that she died intestate and were willing to be bound by such a statement. Because of the separation and estrangement of appellant and his wife and a property settlement between them on the date of separation, the parties did not know who would be entitled to the estate of the deceased under the facts and circumstances and under the law governing such matters. A question was also raised for the consideration of the parties as laymen as to whether or not Aubrey Carlton would be entitled to be reimbursed out of the estate of the deceased for his assistance rendered her by going to aid her at the time of the separation and by taking her into his own home and caring for her after the separation until her death. Such doubtful questions of law and of facts prompted the parties to execute a compromise agreement in order to avoid litigated controversies. They therefore voluntarily executed such an agreement and acknowledged it separately before a notary. The record reflects no claim or suggestion of fraud, mistake, misrepresentation, compulsion or concealment of facts in connection with the execution of the compromise agreement. For these and other reasons found by the trial court to exist, the courts of Texas will not aid appellant to violate their compromise agreement to "settle such estate amicably and as inexpensively as possible" because "a bona fide dispute existed" between the parties. 15 C.J.S., Compromise and Settlement, § 23, pp. 738–739; People's Ice Co. v. Glenn, Tex.Civ.App., 8 S.W.2d 735, 738, and other authorities there cited; Ross v. Seip, Tex.Civ.App., 154 S.W.2d 958; Scott v. Lott, Tex.Civ.App., 247 S.W. 685; Holmes v. Tyner, Tex.Civ.App., 179 S.W. 887, 894.

In my opinion, the authorities cited in this dissenting opinion control and determine the material issues here presented, and the authorities cited in the majority opinion do not control or in any way determine the material issues here presented.

Under the record presented and the authorities cited, it is my opinion that the trial court was justified in finding and concluding that appellant, as well as appellees, voluntarily entered into the contract in question in good faith, that the same is a valid contract and that all of them were bound by its terms, which could not be changed or varied by oral testimony. The trial court was also justified in finding and concluding that the terms of the contract was not "a mere promise" of appellant to "make a gift" of money to each of the Carlton brothers, appellees herein.

For the reasons stated, it is my opinion that appellant's points of error should all be overruled and the judgment of the trial court should be affirmed.