**RALSTON OIL AND GAS COMPANY, Plaintiff-Appellant,**

v.

**GENSCO, INC., Defendant-Appellee.**

**GENSCO, INC., Plaintiff-Appellee,**

v.

**JACK RALSTON OIL & GAS COMPANY, Defendant-Appellant.**

No. 81–1592.

United States Court of Appeals, Fifth Circuit.

June 9, 1983.

G.R. Poehner, Richard E. Roberts, Dallas, Tex., for plaintiff-appellant.

Paul Green, San Antonio, Tex., Jack Ware, Uvalde, Tex., for defendant-appellee.

Before WILLIAMS and JOLLY, Circuit Judges, and WILL *, District Judge.

E. GRADY JOLLY, Circuit Judge:

This diversity action involves a claim by Ralston Oil and Gas Company[1] against Gensco, Incorporated,[2] for damages and attorneys' fees growing out of a sale of allegedly defective pipe system in Webb County, Texas. In addition, this action involves a suit by Gensco against Ralston upon a sworn account for recovery of money claimed due Gensco for the pipe sold to Ralston.[3] Ralston claimed $615,491.33 direct, indirect and consequential damages, alleging breaches of express and implied warranties. Ralston also sought treble damages and attorneys' fees as provided under the Texas Deceptive Trade Practices—Consumer Protection Act [DTPA].[4] Gensco claimed that $47,383.81 was owed on the sworn account and that Gensco was due additionally $11,845.95 in attorneys' fees.

After extensive discovery and entry of a detailed, comprehensive pre-trial order, a six-day jury trial was begun on March 11, 1981. At the close of the evidence both parties moved for a directed verdict in their favor. The motions were denied, and the case was submitted to the jury with instructions and thirteen special interrogatories. The jury found that Gensco had breached express warranties and implied warranties of merchantability and fitness for a particular purpose with respect to the pipe sold by Gensco to Ralston and that Ralston had suffered $54,331.68 in resulting damages. The jury did not specify the basis for its computation of damages. Because the jury found that Ralston discovered the defects in the pipe prior to September 1, 1975, the DTPA was held inapplicable.[5] No attorneys' fees were awarded Ralston. The jury found further that Ralston owed Gensco $32,518.32 on the sworn account, plus $7,600 in attorneys' fees. After offset by the court, the net owed by Gensco to Ralston was held to be $14,213.36.

On appeal, Ralston contends that five errors were committed below. First, Ralston urges that partial remand on the issue of damages is required because the jury may erroneously have found that Ralston lacked the capacity to sue on behalf of its absent principals and may have awarded Ralston only the damages suffered by it. Second, Ralston urges that the court erred in regard to the DTPA insofar as the special interrogatory submitted to the jury was concerned. Third, Ralston urges that it was due attorneys' fees under Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon 1971). Fourth, Ralston avers that the jury's award erroneously allowed Gensco to recover for pipe used to replace defective pipe sold previously by Gensco. Fifth, Ralston urges that Gensco was not due any attorneys' fees as a result of its failure to segregate the fees attributable to its prosecution of the sworn action account and the fees attributable to the defense of Ralston's suit.

We find that Gensco was incorrectly allowed to question Ralston's capacity to sue in behalf of its absent principals and that remand is therefore necessary. We do not find error as to the special interrogatory dealing with applicability of the DTPA nor do we find error insofar as art. 2226 attorneys' fees are concerned. Similarly, we find no error with regard to that portion of the jury's award for Gensco's sworn account

---

* District Judge of the Northern District of Illinois, sitting by designation.

1. Ralston is a privately held Colorado corporation with its principal place of business located in Colorado.

2. Gensco is a Texas corporation with its principal place of business in Texas.

3. Gensco originally filed its action in Texas state court on December 8, 1976. Ralston subsequently filed its action in federal court in the Western District of Texas on December 13, 1976. In February 1977 Ralston removed Gensco's state court action to federal court, and the two cases were consolidated in July 1977.

4. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1975).

5. On September 1, 1975, the DTPA, as amended, was broadened to allow corporations to sue as "consumers." The amendments were prospective only.

which allegedly included replacement pipe. We do find error concerning the attorneys' fees awarded Gensco, and remand is required on this issue.

### I.[6]

In 1972, Jack Ralston began developing the property involved in this suit on the Benavides Ranch in Webb County, Texas, near Laredo. Between July 1972 and June 1974 Ralston drilled sixteen natural gas wells on Benavides and a seventeenth well on a contiguous ranch, Delores. All but one of the wells were "producers."

Ownership interest in the Benavides development was initially obtained by Jack Ralston with the participation of several other investors. The Division Order signed September 11, 1974, does not list Ralston Oil & Gas as an owner in the Benavides gas project.[7] As testified to by Jack Ralston, Ralston Oil & Gas was formed in the wake of the discovery of natural gas on the Benavides property, almost simultaneously with the start-up of production. Ralston Oil & Gas, which served as the operator of the gathering system for the Benavides gas, was therefore created sometime in 1975.

On January 31, 1973, the individual owners of the Benavides interests signed a contract with Lone Star Gas Company, providing for delivery to agreed delivery points of natural gas produced on the Benavides property. Pursuant to that contract, Ralston began construction of the gathering system for distribution of the gas in early 1974. The supervisor of the drilling program and of the construction of the gathering system was Mr. Floyd Ray. One of Mr. Ray's responsibilities was purchasing the pipe for the system.

Mr. Ray had an ongoing business relationship with one of Gensco's salesmen, Mr. Earl Banks. Ray had purchased pipe from Gensco through Banks on previous occasions and had previously purchased surface casing and tubing for the Benavides wells from Gensco.

As a rule, in purchasing line pipe, Ray would contact several suppliers concerning a proposed project and would specify the requirements for the pipe. Ray would then verify the ability of the suppliers' pipe to withstand the expected operating pressure ["psi"]. The test standard was usually twice the expected psi.

Ray did not follow this standard procedure in this instance. Perhaps because of a shortage in the supply of available pipe, Ray, who knew Gensco to be a reliable supplier during such shortages, placed the order with Gensco without seeking bids from other suppliers. Ray specified to Banks that the pipe was to be used in a natural gas gathering system, would be subjected to an operating pressure of 1,000 psi, and that the pipe should have a 2,000 psi test-pressure capability.

For the portions of the gathering system nearest the delivery system, where the psi was greatest, Ray ordered 2⅞ inch pipe. For the remainder of the system, Ray ordered 2⅜ inch pipe. Ray did not specify the type of weld, the grade, wall-thickness, or manufacturer, but left these specifications to Gensco's judgment.

On February 27, 1974, Gensco delivered to Ralston 10,230 feet of 2⅞ inch seamless

---

6. Our summation here of the facts is derived from the record and from Ralston's brief. Gensco agreed in its brief with Ralston's presentation of facts as produced at trial.

7. The Division Order relating to the Benavides development lists the following "owners": Jack Ralston & Associates; Jack Ralston; Clement J. Wohlreich; Mark D. Greenberg, individually, and as trustee for a pension and profit-sharing plan; and Frank L. Stifleman, for himself and as agent for a partnership.

    Some question exists as to whether Ralston Oil & Gas in fact owned any interest in the property. The Division Order setting forth the ownership interest indicates that Ralston Oil & Gas did not own any interest. Although Jack Ralston testified that he had "agreed" to assign his 26.5 percent of the ownership interest to Ralston Oil & Gas, he also testified that no record transfer was ever made.

    No specific finding was made on this point, and we clearly cannot make such a factual determination. As discussed *infra* at note 14 and accompanying text, however, the issue of Ralston Oil & Gas Company's capacity does not turn on this factual issue.

pipe.[8] This pipe remained in service without material failure until replaced in 1976. On April 9, 1974, Gensco delivered approximately 43,700 feet of 2⅜ inch pipe.[9] It is this 2⅜ inch pipe which subsequently failed, basically from splits in the welded seams or from pin-hole leaks along the seams.

When the system was installed it was tested to a pressure of 2,000 psi and proved satisfactory. In September 1974, within two months of the commencement of operations, however, under pressures averaging 800 psi up to 1,100 psi, the 2⅜ inch pipe began to fail along its seams.[10]

Ralston initially tried to repair the system, and shut down the wells producing into the failed portion of the system. In October 1974 Mr. Banks was notified of the failure, and in November or early December, Gensco agreed that it would replace the failed portion. Ralston shut down the entire system in December 1974 so that the replacement could be made. Gensco delivered and installed 6,541.5 feet of new 2⅜ inch pipe at no charge to Ralston. On January 28, 1975, the entire pipe system was hydrostatically tested. The new replacement portion successfully withstood 1,350 psi, but numerous portions of the old 2⅜ inch pipe failed. As a result, in February and March 1975, under Gensco supervision and direction, the entire gathering system was replaced, again at no direct cost. The newly replaced system was tested on March 24, 1975, and production resumed. In mid-April a seam ruptured in the new line. Over the course of the summer, three additional breaks occurred in the new line.

The breaks in the new line grew worse in the fall of 1975. In October 1975 Gensco was informed of the problems with the

second replacement. These problems increased dramatically in December 1975 and January 1976. Ralston again tried to repair the breaks, primarily by using "line clamps," which are two to three feet long, over the ruptured portions of pipe. As the required repairs grew more extensive, however, Ralston could not keep up, and the number of wells shut-in necessarily increased. Gensco was kept fully informed of Ralston's problems during this time.

The necessity of a second replacement became apparent, and in February 1976 Gensco delivered 10,096.65 feet of more expensive, coated and wrapped Grade B 2⅜ inch pipe. This pipe was used in May 1976 to replace defective pipe which had been used as replacement pipe in March 1975. In June 1976, pursuant to Ralston's order, Gensco delivered another 10,108.9 feet of Grade B coated and wrapped 2⅜ inch pipe, with an invoice price of $11,038.92.[11] This pipe was installed in June 1976.

During the remainder of the summer of 1976, while a great deal of work remained to be done on the second replacement, the relationship between Ralston and Gensco split at the seams. Ralston was angry about the seeming inability of Gensco to supply suitable pipe for the gathering system, and Gensco was insistent that Ralston satisfy Gensco's credit demands for the Benavides property and other property of Ralston's for which Gensco had supplied pipe. Gensco would not go forward with the remaining work on the replacement, and when Ralston ordered the pipe to complete the second replacement of the system, it ordered the pipe from Southwest Sales of Albuquerque, New Mexico. Ralston paid for the pipe and for its installation. The

8. Seamless pipe is molded by forcing a solid steel cylinder, or "billet," over a stationary plug.

9. The 2⅜ inch pipe was electrically welded pipe. Welded pipe is formed by rolling a flat steel plate, or "skelp," and electrically welding the edges together.
  On the invoice for the 2⅜ inch pipe, Gensco stated that this was "X–42" pipe. This designation indicates various specifications, including pressure-withstanding capabilities, in con-

formity with standards established for "X–42" pipe by the American Pipe Institute.

10. The ruptures in the pipe, which was covered by one foot of earth, were detected either from holes in the ground (seam splits) or from small, vaporized geysers of gas (pin-hole leaks).

11. This pipe and the charge for it were a part of the sworn account action originally brought by Gensco in state court.

second replacement was completed toward the end of 1976 and has been satisfactory.

As previously stated, Ralston sued for breach of express and implied warranties and for violation of the DTPA and for attorneys' fees under the DTPA. From claimed damages of $615,491.33 [12] the jury returned a verdict, upon special interrogatories, of $54,331.68. Against this, however, the jury found that Ralston owed Gensco $32,518.32 plus $7,600 in attorneys' fees.

## II.

As a preliminary matter, we note the issues which are *not* before this court. We are not concerned with the question of breach of warranty, express or implied, or with the myriad subordinate factual and legal conclusions necessary to a finding of such breach. We are not concerned with the question of whether Ralston notified Gensco timely about the faulty pipe. The jury concluded that Gensco breached both express and implied warranties, that Ralston notified Gensco promptly of the breaches, and that Gensco was liable. Gensco does not appeal from this portion of the judgment.

The questions which we must address concern Ralston's capacity to recover, as agent, damages suffered by the absent principals and whether the jury was prejudicially confused by the broaching of this issue during the trial; whether the DTPA is applicable to any portion of the breaches; whether Ralston is due attorneys' fees under article 2226; whether the jury improperly awarded Gensco $11,038.92 on its sworn account claim when that sum represented the cost of pipe which went to replace defective pipe; and whether Gensco should have been awarded attorneys' fees when it failed to apportion the fees as incurred in defending the Ralston claim and in pursuing Gensco's sworn account claim.

### A.

Ralston urges that a partial remand for redetermination of damages is necessary because Gensco wrongfully and untimely asserted that Ralston lacked capacity to sue and to recover in behalf of absent principals.[13]

The question of Ralston's capacity to sue in behalf of its absent principals was neither averred by Ralston in its initial or amended complaints nor denied by Gensco in its answer. Nor was the issue listed as a legal or factual issue in the pre-trial order approved by both parties. Instead, this question was raised during trial by Gensco, which asserted repeatedly that Ralston at most was due only 26.5 percent of the damages claimed.[14]

We do not consider it necessary to base our decision regarding this issue on the substantive question of Ralston's capacity to recover for its absent principals.[15] That

12. The damages claimed by Ralston are broken down as follows:

| | | |
|---|---|---|
| (a)Repair Expenses | | |
| (i) Before First Replacement | $ 2,311.97 | |
| (ii) After First Replacement | 10,398.99 | |
| | | $ 12,710.96 |
| (b)Replacement Expenses | | |
| (i) Incidental to First Replacement | 3,161.23 | |
| (ii) Second Replacement | 95,747.90 | |
| | | 98,909.13 |
| (c)Natural Gas Lost Through Line Breaks | | 15,654.26 |
| (d)Lost Production and Lost Transportation Payments | | 488,216.98 |
| | TOTAL | $615,491.33 |

13. Ralston had originally urged that this court recompute the damages entered by the jury. This additur request was withdrawn at oral argument.

14. As discussed *supra,* note 7, Jack Ralston testified that his 26.5 percent ownership interest had been transferred informally to Ralston Oil and Gas. No record transfer was ever entered, however.

15. We do note that under *Texas Gas Corp. v. Hankamer,* 326 S.W.2d 944, 958–59 (Tex.Civ. App.1959), Ralston qualifies as an agent which could recover for absent principals. Regardless of its ownership *vel non* of interest in the property, Ralston was authorized to sell the gas to collect for gas sold and to remit payments to the principals. The contract sued upon was between Ralston and Gensco, with Ralston contracting in its own name. The principals were

Ralston intended to recover the total damages—and not just those damages suffered by it alone—is clear from Ralston's pleadings and from the discovery materials provided Gensco. Under Fed.R.Civ.P. 9(a),[16] it was incumbent upon Gensco to plead specifically that Ralston lacked the capacity or authority to recover for its absent principals.

Gensco states that it satisfied the Rule 9(a) requirements by generally denying that Ralston was entitled to any recovery. Were this sufficient to raise the question of capacity, Rule 9(a) would be rendered superfluous.

The failure to plead lack of capacity waives the right to object. *Lang v. Texas & P. Ry. Co.,* 624 F.2d 1275, 1277 (5th Cir.1980); *Garbincius v. Boston Edison Co.,* 621 F.2d 1171, 1174 (1st Cir.1980). Gensco waived this issue and should not have been heard to raise it during trial. While Ralston did not object as vigorously as it perhaps should have to Gensco's raising of this issue, Ralston adequately preserved its objections to Gensco's trial tactics. Most notably, Ralston sought a directed verdict on the issue of capacity. This was denied. Additionally, Ralston submitted a proposed jury instruction providing that Ralston could recover for its absent principals. This, too, was denied, and Ralston objected to its denial. Given the impropriety of Gensco's repeated actions at trial and the high probability of jury confusion, the instruction should have been granted.

The jury's determination of damages does not indicate the basis upon which the amount of damages owed Ralston was achieved. We do not know whether the jury's determination was affected by Gensco's intimation that Ralston could recover at most 26.5 percent of the damages claimed, but given Gensco's repeated efforts to attack Ralston's capacity, it certainly may well have been. Given the waiver of this issue by Gensco, its attempts at such a latter-day confusion cannot be tolerated.

This case must be remanded to the district court as a result of the improper introduction of this issue before the jury. As discussed in part IV of our opinion *infra,* retrial in this regard will be limited to ascertainment of damages resulting from breach of the express and implied warranties. The question of liability will not be retried.

## B.

The DTPA, which provides for treble damages and attorneys' fees, was amended effective September 1, 1975, to allow corporations, for the first time, to sue as "consumers" under the Act. Under the amended DTPA, § 17.50(a)(2), "consumers" could maintain an action for "a failure by any person to comply with an express or implied warranty." The issue with which we are concerned is whether a "failure to comply" occurred at the time Ralston discovered the defects in the pipe (i.e., before September 1, 1975, and before coverage of DTPA) or when Gensco refused to correct the defects (i.e., when Gensco would not complete the second replacement of the gathering system in the summer of 1976).

Ralston urges that "failure to comply" with a warranty includes a "failure to honor" that warranty subsequent to sale and that the district court was therefore in error when it submitted a special interrogatory to the jury asking: "Do you find from a preponderance of the evidence that Ralston discovered the defects in the replacement pipe prior or subsequent to September 1, 1975?" Ralston urges that the date of discovery is not the relevant date, rather, that

---

not parties to the contract. When Gensco sought payment on the invoices, it sought payment solely from Ralston. Under *Texas Gas,* these facts suffice to allow Ralston to recover on its own and on behalf of its principals, even though Ralston never proved record ownership in the leasehold estate.

**16.** "Capacity .... When a party desires to raise an issue as to ... the capacity of any party to sue ... in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."

the relevant date was when Gensco refused to repair the pipe in the summer of 1976, and that the effect of this interrogatory was to preclude incorrectly a finding of liability under the DTPA.

As previously discussed, when the DTPA was enacted in 1973, it did not include corporations within the ambit of "consumers" which could maintain actions under the Act. The "Relief for Consumers" was the same, however, as in 1975, *viz.:* upon "failure by any person to comply with an express or implied warranty," an action could be brought under the DTPA for treble damages and attorneys' fees. 1973 Tex.Gen. Laws, ch. 143, § 1 at 326 (DTPA § 17.- 50(a)(2)). In 1977, Texas amended § 17.- 50(a)(2) of the DTPA by deleting the "failure to comply" language and substituting language allowing maintenance of an action under the Act "for breach of an express or implied warranty." 1977 Tex.Gen.Laws, ch. 216, § 5 at 603.

Ralston argues that the Texas legislature obviously intended that "breach of a warranty" not have the same meaning and application as "failure to comply." If the meaning and applicability were identical, Ralston argues, the legislature would have had no reason to have amended the statutory section. "By its amendatory Act, the legislature must be presumed to have intended some amendment of existing law." *Nelms v. Gulf Coast State Bank,* 516 S.W.2d 421, 424 (Tex.Civ.App.1974).

Ralston argues further that the recent Texas Supreme Court case of *Austin Co. v. Vaughn Building Corp.,* 25 Tex.Sup.Ct.J. 427 (July 17, 1982), settles this question conclusively. We will discuss the *Austin* case first and then discuss the DTPA statutory language argument.

In *Austin,* Vaughn and Austin entered into a contract in April 1968 whereby Austin agreed to construct a plant and office building for Vaughn. The specifications for the building included a roof of "[a]ggregate surfaced built-up asphalt waterproofing installed in accordance with the manufacturer's specifications for a 20-year bondable type roof." The contract also provided the express warranty that Austin guaranteed the work against defective workmanship and material for one year: "Upon written notice of any such defects, Austin will either make necessary repairs or at its option request Owner to make such repairs, all at Austin's expense." In addition to this express warranty, there were the implied warranties of merchantability and fitness.

The building was completed in January 1969. In 1970 leaks developed and were discovered in the roof. Notice was provided Austin, and Austin made numerous unsuccessful attempts to repair the leaks. Ultimately, Vaughn demanded a new roof, at Austin's expense. In July 1973 Austin refused to repair the roof, said that the leaks were not its fault, and would not pay for the repairs. Vaughn brought suit, alleging breaches of express and implied warranties.

The suit, which was prior to enactment of the DTPA, involved the applicability of Texas's four-year statute of limitations. Resolution of this issue turned upon whether the breach occurred when the leaks were discovered or whether the breach occurred when Austin refused to repair the roof.

The Texas Supreme Court stated that:

The jury found that an ordinarily prudent person exercising ordinary care would have discovered the defect on November 29, 1972. The court of appeals treated this as the date on which limitations began to run as to Vaughn's cause of action for breach of the implied warranty. This was not, however, the date limitations began to run as to Vaughn's cause of action for breach of the express warranty.

The Texas Supreme Court did not alter the court of appeals' determination as to the point at which the implied warranty was breached, but, as to the express warranty, the court held that the breach occurred when Austin refused to replace the roof after having been notified of the defects.

We draw several conclusions from the *Austin* decision. First, its applicability to the instant case is perforce limited by the fact that it was not based on an interpreta-

tion of the DTPA. In the instant case we are specifically concerned with the Texas legislature's intent when it provided for recovery specifically for "failure to comply" with a warranty. As Ralston notes in its own brief, "the fundamental rule controlling the construction of a statute 'is to ascertain the intention of the legislature expressed therein....'" *Woods v. Littleton,* 554 S.W.2d 662, 665 (Tex.1977) (quoting *City of Mason v. West Texas Utilities Co.,* 150 Tex. 18, 237 S.W.2d 273, 278 (Tex. 1950)). Insofar as *Austin* does not concern the DTPA, it obviously cannot shed great light on the Texas legislature's intent in enacting the DTPA.

Second, *Austin* involved an express warranty to repair the defective roof at Austin's cost. Of course the breach of that express warranty occurred at the time Austin refused to comply with the warranty. No such express warranty to repair is involved in the instant case. The only express warranty involved was the invoice notation that "X–42" pipe was being supplied, i.e., pipe which conformed with the American Pipe Institute's pressure-withstanding specifications for "X–42" pipe.

Finally, if any weight is ascribed to *Austin's* precedential value herein, it would fall more heavily in Gensco's favor. The Texas Supreme Court did not disturb the lower court's determination that the breach of the *implied* warranty occurred at the time the defects should have been discovered. The implied warranty in *Austin* was to provide a leakproof roof. Thus, in all material respects, the implied warranty in *Austin* was to the same effect as the express warranty herein, i.e., that the "X–42" pipe would be "leakproof" up to a certain psi. *Austin* would therefore seem to support Gensco's contention—and the lower court's special interrogatory—that Gensco's breach occurred when Ralston discovered the defects in the pipe, prior to September 1, 1975, before the inclusion of Ralston under the DTPA.[17]

As previously mentioned, however, *Austin* was not concerned with the DTPA, and we should not therefore be too concerned with *Austin.* We are concerned with the DTPA statutory language, and for that purpose look to our recent decision in *Mercer v. Long Mfg. N.C., Inc.,* 665 F.2d 61 (5th Cir.1982), which dealt with the effect of the 1977 DTPA amendments, and to various Texas court decisions on point.

*Mercer* involved a defective peanut combine. Action was brought under the pre-1977 DTPA alleging breach of implied warranties. The lower court found that the alleged breach had occurred and that a breach of warranty was a per se violation of the DTPA. The defendant alleged that the lower court erred in equating "failure to comply" with "breach," contending, as Ralston contends, that "failure to comply" involves scienter or willful action, such as here, Gensco's ultimate refusal to replace the pipe.

In *Mercer's* discussion of the 1973/1975 "failure to comply" language as compared to the 1977 "breach language," we determined, based on Texas cases on point, that "the language in the 1973 Act is [not] significantly different from that in the 1977 amendment." 665 F.2d at 72. We noted that "the term 'breach of warranty' is used frequently in referring to the nature of a cause of action *prior* to the 1977 amendments." *Id.* We also concluded that "the modification [in the 1977 amendment] could just as easily reflect the legislative awareness that § 17.50(a)(2) did not require intent and a subsequent desire to require this additional element." *Id.* at 73. Finally, we expressly rejected the defendant's assertion that the 1973/1975 "failure to comply" language required willful action, e.g., failure to repair a defect. *Id.* *Mercer* thus supports Gensco's contention that "failure to comply" under the DTPA is synonymous with "breach" and occurred when Ralston learned of the defects in the pipe.

---

**17.** Ralston does not refute the jury's finding that it discovered the defects prior to September 1, 1975.

In an excellent opinion entered by the district court below in response to Gensco's Motion for Partial Summary Judgment on Ralston's DTPA claim, the court discussed numerous Texas court cases which support Gensco's argument as to the date of the breach. Because the court found that Ralston might be able to prove the discovery of defects after September 1, 1975, however, it denied Gensco's motion.

Based primarily on *Town & Country Mobile Homes, Inc. v. Stiles*, 543 S.W.2d 664 (Tex.Civ.App.1976), the court below found that:

> [T]he relevant date for determining when a breach of warranty claim arose is when the defects were discovered, not when they were remedied. In order for a misrepresentation to be covered by the Act, it must have taken place after the effective date. The fact that continuing effects occur over time is irrelevant, because the deceptive practice is the misrepresentation, not the resulting consequences.

In *Town & Country* the plaintiffs purchased a mobile home. They moved into the home and soon discovered defects in its construction. This occurred prior to DTPA's enactment. Shortly after the enactment of the DTPA, the manufacturer's service representative made some repairs and the manufacturer's service manager wrote that he hoped the plaintiffs were happy with the mobile home now that it was "all fixed up." Unfortunately, it was not "all fixed up," and the plaintiffs brought suit against both the seller and the manufacturer.

The court found that the DTPA applied as to the manufacturer because of its post-DTPA representation that the home had been repaired. As to the seller, however, the *Town & Country* court held that the DTPA had not been enacted at the time of the discovery of the defects and was not applicable:

> Appellants urge that the breach of warranty was a continuing act which occurred after May 21, 1973. If a breach of warranty occurred on the date of sale of defective or misrepresented goods and then was a continuing breach each date until repaired, then it would appear that limitations would never begin to run because of the continuing nature of the breach. We believe that once the defects were known, shortly after the sale in this case, the breach of warranty had occurred, the cause of action arose and damages would be determinable at that time.

543 S.W.2d at 666.

Ralston does not contest that it discovered the defects after September 1, 1975. Nor does it allege that Gensco ever represented after September 1, 1975, that the recurrent problems had been "all fixed up."

Based on our previous decision in *Mercer* and on the *Town & Country* decision by the Texas Court of Civil Appeals, we believe the lower court determined correctly that the breach of warranties here occurred when the defects were discovered by Ralston, not when Gensco would not make further efforts to repair the pipe. The implied warranties with which Gensco "failed to comply" were the warranties of fitness for a particular purpose and of merchantability. These warranties clearly go toward the quality and soundness of the pipe itself—not toward Gensco's failure to repair that pipe. The only express warranty breached by Gensco—the invoice claim that the pipe was "X–42" pipe—similarly goes toward the capacity of the pipe supplied, not toward any promise by Gensco to repair any defects. Thus the "failure to comply" was the failure to supply pipe which conformed to the promised specifications.

In the absence of any showing that, subsequent to September 1, 1975, Gensco represented that it had repaired the gathering system or that Ralston "discovered" defects for the first time, we conclude that the breaches occurred prior to September 1, 1975, and that the special interrogatory submitted by the court was not in error.

**C.**

The next issue concerns Ralston's ability to recover attorneys' fees pursuant to article 2226 of the Texas Civil Statutes.[18]

There is no question here but that Ralston brought its claim upon a written contract, that its claim was found valid by the jury, and that it gave notice more than thirty days prior to entry of judgment. The only question is whether Ralston waived its claim to fees under article 2226 by never pleading for such fees until after the jury denied its DTPA claim for attorneys' fees.[19]

■ Texas law is clear on the point that, although article 2226 is to be liberally construed, a party must plead entitlement to article 2226 fees at least with some specificity in order to recover. *Chiles v. Becker,* 608 S.W.2d 816, 819 (Tex.Civ.App.1980). Ralston's attorneys, for whatever reason, put all their eggs in the DTPA basket. When it sprang a leak they tried to pick up another. Unfortunately for them, it was too late.

**D.**

■ The next issue concerns the action on the sworn account brought by Gensco, for which account $32,518.32 was awarded by the jury. Ralston claims that this $32,518.32 includes $11,038.92 in charges for pipe delivered in June 1976 to replace defective pipe. *See supra* note 11 and accompanying text. Because a party is due the cost of replacing a defective product, *General Supply and Equipment Co., Inc. v. Phillips,* 490 S.W.2d 913, 919 (Tex.Civ.App.1972), Ralston urges that this $11,038.92 should be deducted from the award on the sworn account.

Gensco asserts that Ralston merely ordered new pipe, which was "Grade B" pipe, coated and wrapped and more expensive than the "X–42" pipe previously ordered, never specified that the pipe was to be replacement pipe, and failed to prove to the jury that the pipe was used as replacement pipe. According to Gensco, this simply is a jury question which was resolved against Ralston.

Ralston moved for a directed verdict on this issue. The directed verdict was denied. Under our decision in *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), a directed verdict should be granted where the evidence is "so overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict . . . ."

■ We cannot find that the evidence to support reduction of Gensco's sworn account was "so overwhelming" that the question should have been taken from the jury. Although it is apparent in the record that Gensco knew that the 1975 replacement pipe had failed to a significant extent, it is not clear that Ralston informed Gensco that it was ordering the pipe in June 1976 as replacement pipe. While under the *General Supply* case, replacements for defective goods are not chargeable, we do not read that case to provide a carte blanche for purchasers. Clearly, a duty exists for the purchaser when replacing the defective product to inform the seller that replacement use is being made and that no payment will be made for the replacement goods. There was such an understanding with regard to the 1975 replacement. No such understanding is revealed in the record as to the June 1976 replacement. The jury apparently found no such understanding. In the absence of an "overwhelming" indication of such, we find no error and therefore affirm the jury's determination on this issue.

**18.** Any ... corporation ... having a valid claim against a person or corporation ... founded on oral or written contracts, may present the same to such ... corporation ... and, if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees .... This Act shall be liberally construed to promote its underlying purposes.

**19.** The pre-trial order, upon which Ralston relies in regard to the absence of issue as to capacity, contains no mention of attorneys' fees under article 2226.

E.

Finally, we are faced with the question of the court's award to Gensco of $7,600 in attorneys' fees. Ralston urges that because Gensco failed to apportion those fees between Gensco's sworn account claim and Gensco's defense of the Ralston suit, which Gensco lost, Gensco should not have been awarded any fees.

Gensco states in its brief that the duties of its two principal attorneys were clearly divided, with one attorney working only on the sworn account action and the other working only on Gensco's defense of the Ralston claim. The record does not support this assertion, however. The attorney ostensibly prosecuting Gensco's sworn account action also played a significant role in the defense against Ralston's claim, both during discovery and at trial. As set forth in *Kosberg v. Brown,* 601 S.W.2d 414, 418 (Tex.Civ.App.1980) and *Bray v. Curtis,* 544 S.W.2d 816, 819–20 (Tex.Civ.App.1976), where an attorney is involved with more than one action in a suit and not all of those actions are accorded attorneys' fees, "those causes for which no recovery for attorney's fees may be had must be segregated and excluded from consideration in determining reasonable attorney's fees." *Kosberg,* 601 S.W.2d at 418.

No apportionment or break-down of the fees for the attorney who participated in both parts of this case was provided. No weeding-out of the overlap was provided.

It is therefore necessary that this portion of the case be remanded and that the attorneys' fees awarded for prosecution of the sworn account be distinguished from those applicable to the defense of the Ralston suit. It may be that the court will determine that the $7,600 was correct; or, upon proper segregation of the attorneys' fees, it may be determined that a lesser or a greater fee is correct. Based on the record before us, however, we cannot tell what attorneys' fees were proper on the sworn account action.

III.

In conclusion, we enumerate the following points of our opinion:

1. On the record facts and under Texas law, the question of Ralston's capacity to recover in behalf of its absent principals was improperly raised at trial. This case is therefore remanded for retrial on the issue of damages suffered by Ralston and its absent principals. Upon remand, Gensco shall not be allowed to raise the issue of capacity. On remand, Ralston may offer full proof of damages as was offered in the initial trial. We recognize that at retrial it may be appropriate for the jury to hear and receive evidence that relates to liability either because such evidence is necessary as a predicate to damages or because it may be of overlapping relevance. Such matters are, of course, within the sound discretion of the trial judge.

2. Liability for breach of express and implied warranties was established at trial, and, in response to the special interrogatories, the jury found Gensco liable. Gensco has not appealed that determination, and this will not be an issue on remand.

3. We have found that the breach occurred prior to Ralston's inclusion within coverage of the DTPA. Ralston therefore cannot recover treble damages.

4. Having found that Ralston is not due attorneys' fees under the DTPA or article 2226, Ralston cannot recover attorneys' fees.

5. We have found that the jury's determination was proper as to Gensco's claim on the sworn account. This claim will not be retried.

6. The issue of Gensco's attorneys' fees is remanded for redetermination upon adversary presentation of proof of Gensco's fees specifically and separately incurred with relation to the sworn account action.

AFFIRMED IN PART AND REMANDED IN PART.