# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____
## No. 90-2654
_____

BANK ONE, TEXAS, N.A. and FEDERAL
DEPOSIT INSURANCE CORPORATION AS
RECEIVER FOR MBANK HOUSTON, N.A.,

Plaintiffs-Third Party Defendants-Appellants,

versus

SUZAN E. TAYLOR d/b/a
EXPLORATION SERVICES,

Defendant-Third Party Plaintiff-Appellee,

versus

WORTH OPERATING, INC., ET AL.,

Third Party Defendants.
_____
### Appeal from the United States District Court for
### the Southern District of Texas
_____
(August 18, 1992)

Before REYNALDO G. GARZA and GARWOOD, Circuit Judges, and MAHON,
District Judge.*

MAHON, District Judge:

This appeal arises out of a lawsuit commenced by MBank
Greens Parkway, N.A., predecessor of MBank Houston, N.A., (MBank)
to recover on three unpaid promissory notes executed by Ms. Suzan
Taylor d/b/a Exploration Services (Taylor).  A jury trial
resulted in a verdict of $9.6 million in favor of Taylor based
upon her assertion of various lender liability claims against
MBank.  For the reasons stated below, we conclude that the

_____

punitive damage award is unsustainable, but find there is

sufficient evidence to support the remainder of the jury's

verdict.

## I.   FACTS AND PROCEEDINGS BELOW

The dispute which brought about the present litigation arose

in 1984.  Taylor at the time was the sole owner of a company

called Exploration Services, a business which provided geological

and geophysical consulting services for oil and gas companies.

In October 1984, Taylor entered into an agreement with C.I. Oil,

Inc. (CI) in which she acquired an interest in a petroleum

drilling prospect in Louisiana known as the Comite Prospect.  In

accordance with their agreement, Taylor deposited $300,000 into

two money market checking accounts at MBank to pay CI for an

interest in the prospect.  The agreement provided that once CI

turned over Taylor's interest in the prospect and furnished

Taylor the well log showing the well had been drilled to the

specified depth, Taylor would authorize MBank to release the

$300,000 to CI.  CI had no agreement with MBank nor was it a

signatory on either account.

Though Taylor had originally instructed MBank to pay the

deposited funds to CI, she changed those instructions when it

appeared that CI could not or would not transfer all of the

interest to her in accordance with their agreement.  On

November 20, 1984, Taylor wrote MBank instructing it to disburse

$220,000 of these funds to CI and $80,000 to Sequoia Resources

1

"in accordance with the . . . [a]greement by and between Exploration Services and C.I. Oil, Inc. and only upon written authorization of Suzan E. Taylor." The following day, CI and Sequoia agreed to this disbursement arrangement.

On December 17, 1984, CI produced the well log described in the agreement and made written demand upon MBank for the $220,000, informing the bank that CI would hold MBank liable for any disbursement of those funds in a "manner contrary to the distribution instructions of Taylor's letter of November 20." Because Taylor and CI continued to dispute the amount of lease interest to be conveyed under their agreement, Taylor refused to provide MBank written authorization for the release of the $220,000 to CI. MBank therefore immediately froze the accounts and demanded that Taylor settle her dispute with CI. Despite Taylor's repeated requests for MBank to release her funds, MBank continued the freeze on Taylor's accounts for almost four months, insisting that CI and Taylor resolve their differences. During this period, Taylor lost the opportunity to participate in both the Comite Prospect and another prospect called Santa Paula.

When Taylor made another written demand for the funds on March 7, 1985, MBank filed a state court interpleader action against Taylor and CI. Taylor and CI eventually reached a settlement and gave consistent instructions to MBank as to the disposition of the account balances on April 12, 1985. MBank, however, refused to dismiss the state interpleader action or permit Taylor to have access to the funds until she signed a

2

release absolving MBank from all liability.  On April 16, 1985,

MBank, Taylor and CI reached a final settlement of the

interpleader action in which MBank agreed to absorb its

attorney's fees in return for Taylor's agreement to release MBank

from any liability.  The interpleader action was later dismissed

on May 8, 1985, on MBank's motion for nonsuit.  The next day

Taylor received a letter from MBank demanding that all four of

her outstanding loans be paid in full within five days[1] even

though the two secured loans were not past due.  Six days later,

MBank repossessed Taylor's Jaguar automobile and commenced

admiralty proceedings in federal court to repossess Taylor's

yacht which was later seized and sold at public auction.

MBank then initiated the present litigation in state court

to recover the indebtedness on the two unsecured loans and

recover the deficiency on the note secured by the Jaguar

automobile.  Taylor filed a counterclaim against MBank contending

that the release executed by Taylor in settlement of MBank's

interpleader action was procured by fraud and economic duress and

was invalid for want of consideration.  In addition, Taylor

claimed that because MBank had tortiously frozen her accounts,

she lost the opportunity to participate in the Comite and Santa

Paula prospects causing her to suffer damages in excess of $28

---

[1]Taylor had executed the following promissory notes in favor of MBank:  (1) an unsecured loan in the face amount of $90,000; (2) an unsecured loan in the face amount of $50,000; (3) a loan in the face amount of $29,062.81, secured by a 1984 Jaguar automobile; and (4) a loan in the face amount of $106,651.96, secured by a Sea Ray yacht.

million.  Taylor also asserted that MBank wrongfully accelerated the car and yacht loans and had conspired with her former business partner, Worth Energy Corporation, to her detriment.

The trial of this case lasted seven weeks and produced over 5000 pages of transcript and several volumes of exhibits.  At the conclusion, the jury found MBank liable for engaging in false, misleading and deceptive practices in violation of the Texas Deceptive Trade Practices--Consumer Protection Act (DTPA), Tex. Bus. & Com. Code Ann. §§ 17.41-17.826 (Vernon 1987).  The jury also found MBank had tortiously interfered with Taylor's business dealings, conspired to harm Taylor's business, and failed to act in good faith in connection with the "Comite" accounts as well as the car and yacht loans.  The jury found that, while there was no evidence of fraud in the execution of the settlement agreement, MBank did coerce Taylor through economic duress to sign the release and failed to give valid consideration for the release agreement.

Based upon the jury's answers to the special issues, the district judge entered final judgment against MBank.  In the judgment, the court deducted from the jury award the past due principal and accrued interest on two unsecured notes Taylor concededly owed.  In addition, the court entered a take-nothing judgment on MBank's claim for the deficiency on the third note secured by Taylor's Jaguar and denied MBank's claim for attorney's fees and expenses in connection with the two unsecured loans.  The trial court later denied MBank's motion for judgment

4

notwithstanding the verdict, and final judgment was entered in the amount of $9,639,841.65.[2]

MBank thereafter filed post-judgment motions for new trial and to modify, correct, or reform the judgment. Before the state trial court could rule on MBank's motions, MBank was declared insolvent, and the Federal Deposit Insurance Corporation (FDIC) was appointed its receiver. The FDIC, as receiver of MBank, filed a plea in intervention in the state court action and adopted MBank's then current pleadings, including its motion for new trial and motion to modify, correct, or reform the judgment. Following its intervention, the FDIC removed the action to federal district court. The FDIC and Bank One, Texas, N.A., (Bank One), successor-in-interest to MBank, then filed memorandum briefs in support of MBank's previously filed motions for new trial and to alter or amend the judgment. The district court denied the motions, and the FDIC and Bank One appealed the judgment to this court. In this appeal, FDIC, as receiver of MBank, is the proper party to defend against Taylor's counterclaims, while Bank One, successor-in-interest to MBank, is the party entitled to pursue collection on the notes on which MBank originally brought suit.

---

[2]Worth Energy Corporation, Taylor's former business partner and its principal officers Aaron W. Hees and Jim W. Howard were held jointly and severally liable with MBank for approximately $2.4 million of the damages, but did not join in this appeal.

5

## II.  STANDARD OF REVIEW

In the present appeal, the FDIC broadly contends there was insufficient evidence presented at trial to support the jury's findings that Taylor executed the settlement agreement under duress, that the settlement agreement lacked valid consideration, and that MBank committed deceptive practices in freezing Taylor's accounts.  We consider the various insufficiency points cited by appellants as an appeal from the trial court's denial of MBank's motion for judgment notwithstanding the verdict and apply the same standards as that of the district court.  Melear v. Spears, 862 F.2d 1177, 1182 (5th Cir. 1989); Granberry v. O'Barr, 866 F.2d 112, 113 (5th Cir. 1988).[3]  We are guided in this task by the overriding "principle that 'it is the function of the jury as the traditional finder of fact, and not the Court, to weigh conflicting evidence . . . .'"  Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 164 (5th Cir. 1990) (quoting Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir. 1969) (en banc)).  "Weighing conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict."

---

[3]This action was removed post-judgment from the state court to the federal district court.  Accordingly, the scope of our review in this appeal is governed by federal, rather than state law, standards.  Pagan v. Shoney's Inc., 931 F.2d 334, 337 (5th Cir. 1991); Garner v. Santoro, 865 F.2d 629, 642 (5th Cir. 1989); see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 437 (1974).

Gibraltar Sav. v. LDBrinkman Corp., 860 F.2d 1275, 1297 (5th Cir. 1988) (citing Dartez v. Fibreboard Corp., 765 F.2d 456 (5th Cir. 1985), cert. denied, 490 U.S. 1091 (1989)). We have defined substantial evidence as "'evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" Transoil (Jersey) Ltd. v. Belcher Oil Co., 950 F.2d 1115, 1118 (5th Cir. 1992) (citing Boeing, 411 F.2d at 374-75). In reviewing a denial of a motion for judgment notwithstanding the verdict, the appellate court is bound to consider all of the evidence and all reasonable inferences in the light most favorable to the prevailing party, Rideau v. Parkem Indus. Servs., Inc., 917 F.2d 892 (5th Cir. 1990), and the jury verdict must be upheld unless "the facts and inferences point so strongly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Boeing, 411 F.2d at 374. Having set out the applicable standard of review, we now turn to the appellants' contentions raised in this appeal.

## III. THE RELEASE

At the outset, the FDIC maintains the jury erred in setting aside the release because there is overwhelming evidence that the release agreement was supported by valuable consideration. We disagree. Having carefully reviewed the record before us, we hold there was substantial evidence to support the jury's determination that the release was void for lack of consideration.

7

In Texas, a release is treated as a type of contract, Jackson v. Fontaine's Clinics, Inc., 499 S.W.2d 87, 92 (Tex. 1973), and like any other contract, must be supported by valuable consideration. Victoria Bank & Trust Co. v. Brady, 779 S.W.2d 893, 903 (Tex. App.--Corpus Christi 1989), modified, 811 S.W.2d 931 (Tex. 1991); Tobbon v. State Farm Mut. Auto. Ins. Co., 616 S.W.2d 243, 245 (Tex. Civ. App.--San Antonio 1981, writ ref'd n.r.e.). Consideration for a release "can consist of [either] a benefit to the promisor or a loss or detriment to the promisee." Garcia v. Villarreal, 478 S.W.2d 830, 832 (Tex. Civ. App.--Corpus Christi 1971, no writ); see also Buddy L, Inc. v. General Trailer Co., 672 S.W.2d 541, 547 (Tex. App.--Dallas 1984, writ ref'd n.r.e.). If it is determined that a release was executed without valuable consideration, it may be invalidated. Victoria Bank, 779 S.W.2d at 903; McClellan v. Boehmer, 700 S.W.2d 687, 693 (Tex. App.--Corpus Christi 1985, no writ).

As stated previously, Taylor signed a release in 1985 in which she agreed to absolve MBank from any and all claims or causes of action she might have for its handling of the subject accounts. In return, MBank agreed to forego its right to seek its attorney's fees in the interpleader action. The question whether the release was supported by consideration was submitted as a jury issue, and the jury specifically found that MBank failed to give valid consideration for the release. The FDIC argues on appeal that this factual finding was not supported by substantial evidence because MBank's agreement to absorb its

8

attorney's fees provided ample consideration for the release. Taylor, on the other hand, contends that the release was completely lacking in valid consideration and must be set aside because MBank filed an improper interpleader and therefore forfeited any right to recover its attorney's fees.

Under Texas law, MBank was entitled to an award of attorney's fees in the interpleader action only if MBank proved it was "a disinterested stakeholder who ha[d] reasonable doubts as to the party entitled to the funds or property in [its] possession, and who in good faith . . ." filed an interpleader action against the claimants. United States v. Ray Thomas Gravel Co., 380 S.W.2d 576, 580 (Tex. 1964); Foreman v. Graham, 693 S.W.2d 774, 778 (Tex. App.--Fort Worth 1985, writ ref'd n.r.e.). In order to bring an interpleader under Rule 43,[4] a stakeholder is not required to be wholly disinterested in the suit. Rather, it "need only show that it is or may be exposed to double or

---

[4]Rule 43 of the Texas Rules of Civil Procedure governs the procedure for initiating an interpleader action in state court. Rule 43 provides as follows:

> Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in any other rules.

multiple liability as a result of conflicting claims justifying a reasonable doubt as to which claimant is entitled to the funds." Sears Sav. & Profit Sharing Fund v. Stubbs, 734 S.W.2d 76, 79 (Tex. App.--Austin 1987, no writ) (citing Davis v. East Texas Sav. & Loan Assoc., 163 Tex. 361, 354 S.W.2d 926 (1962)); Downing v. Laws, 419 S.W.2d 217 (Tex. Civ. App.--Austin 1967, writ ref'd n.r.e.).  While the stakeholder's interest in the suit is irrelevant for purposes of commencing an action under Rule 43, in order to be entitled to an award for attorney's fees, a stakeholder must be disinterested as to the outcome of the controversy.  See Ray Thomas Gravel Co., 380 S.W.2d at 580; Foreman, 693 S.W.2d at 778; Brown v. Getty Reserve Oil, Inc., 626 S.W.2d 810, 815 (Tex. App.--Amarillo 1981, writ dism'd).

Texas courts have articulated a number of specific requirements for properly instituting an interpleader action.  A petitioner must plead and prove that:  (1) he is either subject to, or has reasonable grounds to anticipate, rival claims to the same fund or property;[5] (2) he has filed the interpleader without unreasonable delay;[6] and (3) he has made an unconditional tender

---

[5]Great American Reserve Ins. Co. v. Sanders, 525 S.W.2d 956, 958 (Tex. 1975); Ray Thomas Gravel Co., 380 S.W.2d at 580; Davis, 354 S.W.2d at 930; Sears Sav. & Profit Sharing Fund, 734 S.W.2d at 79.

[6]Sears Sav. & Profit Sharing Fund, 734 S.W.2d at 79; National Life & Accident Ins. Co. v. Thompson, 153 S.W.2d 322, 323 (Tex. Civ. App.--Waco 1941, writ ref'd); see also Great American Reserve Ins. Co. v. Sanders, 525 S.W.2d at 959; see generally 1 Roy W. McDonald & Frank W. Elliott, Texas Civil Practice in District and County Courts §§ 3.40, 3.42 (4th ed. 1991); 47 Tex. Jur. 3rd Interpleader § 5 (1986).

10

of the fund into the court.[7]  If a <u>disinterested</u> stakeholder

fails to meet any one of these three prerequisites for filing an

interpleader, he is not entitled to an award of attorney's fees.

The FDIC insists that MBank met all three requirements and

therefore was justified in filing the interpleader.  In deciding

this issue, we first review the deposit agreement between Taylor

and MBank to determine whether MBank had reasonable doubts as to

which party was entitled to the funds.

In November 1984, MBank opened two commercial checking

accounts for Taylor.  The standard deposit agreement, which

Taylor signed when MBank opened the accounts, provided in

pertinent part:

> The Deposit with MBank Greens Parkway, National
> Association, Houston, Texas ("Bank") of any check,
> draft, or other instrument ("Item") or cash shall
> constitute a contract ("Contract"), between Bank and
> the person, firm, association or corporation
> ("Depositor", whether one or more) to whom credit for
> such item and/or cash is given by this Bank.  The terms
> of such Contract are as follows:
>
> 1.  Other than as provided by the terms of this
> Contract, <u>the</u> <u>Bank</u> <u>acts</u> <u>only</u> <u>as</u> <u>agent</u> <u>for</u> <u>Depositor</u>.
> (emphasis added).

In a separate deposit agreement executed in connection with the

opening of the two accounts, it was agreed that:

> All funds at any time on deposit in the aforementioned
> account shall be subject to withdrawal by . . . Suzan
> E. Taylor . . . .

---

[7]<u>Sears Sav. & Profit Sharing Fund</u>, 734 S.W.2d at 79; <u>Cockrum v. Cal-Zona Corp.</u>, 373 S.W.2d 572, 574-75 (Tex. Civ. App.--Dallas 1963, no writ); <u>Bennett v. Smead</u>, 180 S.W.2d 663, 663-64 (Tex. Civ. App.--Texarkana 1944, no writ); <u>see</u> <u>generally</u> McDonald & Elliott <u>supra</u> note 6, § 3.42.

11

>Bank is authorized to honor any and all such withdrawals whether or not they are payable to the order of the person signing, or countersigning, the same, or payable to Bank or Bank's order, and whether or not such withdrawals are presented for cash or for credit to the personal account of the person presenting the same, and Bank need make no inquiries concerning any such withdrawal.

The terms and conditions of the deposit agreements do not refer to a third party agreement, nor do they furnish the bank with any special instructions on how the funds should be applied.  Nowhere is it mentioned that Taylor is restricted from withdrawing any or all of the account funds on deposit at any time.  In addition, CI was not a signatory on the account and had no control over the account funds on deposit.  Though Taylor maintained the accounts in the names "'Comite' Escrow Account III" and "'Comite' Escrow Account IV,"  the law is clear that a mere deposit of earnest money into a bank account is not sufficient to create an escrow contract or create escrow liabilities.  Cowman v. Allen Monuments, Inc., 500 S.W.2d 223, 225-26 (Tex. Civ. App.-- Texarkana 1973, no writ.); cf. La Sara Grain Co. v. First Nat'l Bank of Mercedes, 673 S.W.2d 558, 564 (Tex. 1984)  (deposit creates implied agreement that bank will disburse funds only at the direction of depositor).  Faced with its own deposit agreements, MBank could not reasonably have concluded that these accounts were anything other than commercial checking accounts in which CI had no valid claim or interest.

The FDIC argues that MBank could have reasonable doubts because the agreement executed by Taylor and CI prohibited the bank from releasing the funds contrary to the terms of their

agreement. This agreement, however, was a contract only between CI and Taylor. MBank was neither a party to the contract, nor does the evidence show that MBank expressly or impliedly consented to act as the escrow agent for the parties. Furthermore, there is nothing in the record to suggest that MBank and CI ever entered into any agreement regarding the disposition of the account funds. Absent such an agreement, it is elemental contract law that MBank owed no contractual duty to CI and therefore was not required to recognize CI's putative claim.[8]

The fundamental basis of the relationship between a bank and its customer is the bank's agreement to pay out the customer's money in accordance with his order. In view of the unequivocal terms of the deposit agreement, the jury could reasonably have concluded that MBank did not harbor reasonable doubts as to which party was entitled to the funds and thus did not meet the first requirement for instituting a proper interpleader.

Even if MBank had reasonable doubts, it wholly failed to meet either of the remaining requirements for initiating a proper action in interpleader. MBank was required to file the interpleader action without unreasonable delay. The record in this action indicates that MBank first received a written demand

---

[8]Further, under Texas law a bank is not required to recognize the claim of a third party to any deposit unless it is served with process in a lawsuit filed by such third party. See Tex. Rev. Civ. Stat. Ann. art. 342-704 (Vernon Supp. 1991). Here, CI merely threatened suit and never instituted a civil action against MBank. Therefore, even if CI had a valid claim against the account, MBank was not required to recognize such a third party claim until suit was filed.

13

for the funds on December 18, 1984. In the demand letter, CI made clear that it would hold MBank liable for any disbursement of those funds in a manner inconsistent with the parties' agreement. Despite CI's threatened legal action, MBank failed to take any action until March 7, 1985, when Taylor threatened to sue MBank for wrongful withholding of funds. In the meantime, MBank kept the funds on deposit and delayed the filing of the interpleader for almost 12 weeks in the belief that it could offset the account to reduce Taylor's debt. Instead of acting as a "disinterested stakeholder," MBank, for its own financial interests, continued to hold the funds in Taylor's frozen account for almost three months before commencing the interpleader action. We believe the jury was entitled to conclude that even if MBank had reasonable doubts as to which party was entitled to the funds, it failed to promptly initiate an action in interpleader and, in so doing, failed to "exercise[] that degree of diligence and impartiality which the law requires in order to secure for itself the benefits conferred upon a mere stakeholder under a proper bill of interpleader." National Life & Accident Ins. Co. v. Thompson, 153 S.W.2d at 323-24; see also Sears Sav. & Profit Sharing Fund, 743 S.W.2d at 79.

To fulfill the final requirement for filing a proper interpleader action, the stakeholder also must tender the funds into the court. Under Texas procedure, "[i]f the . . . fund is not actually paid into the registry of the court, it must be tendered and the tender, in order to be valid, must be

14

unconditional."  Cockrum v. Cal-Zona Corp., 373 S.W.2d at 574; Bennett v. Smead, 180 S.W.2d at 664; see also Security Nat'l Bank of Lubbock v. Washington Loan & Finance Corp., 570 S.W.2d 40, 43 n.4 (Tex. Civ. App.--Dallas 1978, writ dism'd).  Here, the account funds were neither paid into the registry of the court nor unconditionally tendered.  Instead, MBank kept the funds on deposit and sought to exercise a purported right of offset.  Even after consistent instructions were given by Taylor and CI as to the distribution of the funds, MBank refused to make an unconditional tender, asserting an additional claim for its attorney's fees.

Thus, even under the most generous reading of the record, there is little, if any, evidence that shows MBank met even one of the three essential requirements for filing a proper interpleader action, let alone that it acted as an innocent disinterested stakeholder in the interpleader action.  Moreover, by wrongfully withholding the funds until Taylor signed a complete release of all claims against it, MBank also failed to exercise good faith in the settlement of the interpleader.  See Bentley v. Grewing, 613 S.W.2d 49, 52 (Tex. Civ. App.--Fort Worth 1981, writ ref'd n.r.e.).  For the reasons stated, we find no grounds upon which MBank could assert a valid claim for attorney's fees.

The FDIC maintains that MBank's forbearance of its claim for attorney's fees in the interpleader action is sufficient

15

consideration to support the release agreement.[9]  In support of

this argument, the FDIC relies upon a long-standing rule of

contracts which states that forbearance to enforce a claim or

right is ample consideration to support a contract even though it

ultimately appears the claim is without merit.  See Kennard v.

McCray, 648 S.W.2d 743, 745-46 (Tex. App.--Tyler 1983, writ ref'd

n.r.e.); Iden v. Ackerman, 280 S.W.2d 643, 646-47, (Tex. Civ.

App.--Eastland 1955, writ ref'd); Russell v. Lemons, 205 S.W.2d

629, 632 (Tex. Civ. App.--Amarillo 1947, writ ref'd n.r.e);

Cleburne State Bank v. Ezell, 78 S.W.2d 297, 299 (Tex. Civ. App.-

-Waco 1934, writ dism'd) (citing Hunter v. Lanius, 82 Tex. 677,

18 S.W. 201 (1892)).  The FDIC, however, fails to recognize an

important exception to this principle.  Forbearance is not

sufficient consideration unless the party asserts the claim in

good faith and has reasonable grounds in believing that he had

such a right.  Stewart v. Friona State Bank, 278 S.W.2d 425, 433

(Tex. Civ. App.--Amarillo 1955, writ ref'd n.r.e); Cleburne State

Bank, 78 S.W.2d at 299; Wells v. Timms, 275 S.W. 468, 471 (Tex.

Civ. App.--Fort Worth 1925, writ dism'd) (citing Von Bradenstein

v. Ebensberger, 71 Tex. 267, 9 S.W. 153 (1888); see 14 Tex. Jur.

---

[9]In its reply brief, the FDIC raises for the first time the
argument that Taylor benefitted from the release because MBank
waived its right to offset the accounts and Taylor obtained an
increased share of the Comite prospect from CI.  Absent manifest
injustice, "this court will not consider arguments belatedly
raised after appellees have filed their brief."  Najarro v. First
Federal Savings and Loan Ass'n of Nacogdoches, Texas, 918 F.2d
513, 516 (5th Cir. 1990).  We find no manifest injustice by
declining to address appellants' arguments on these points.

16

3rd <u>Contracts</u> § 120 (1981); Restatement (Second) of Contracts §

74(1) (1979).  <u>See</u> <u>generally</u> 3 Samuel Williston and Richard A.

Lord <u>A Treatise on the Law of Contracts</u> § 7:45 (4th ed. 1992); 1

Arthur L. Corbin, <u>Corbin on Contracts</u> § 140 (1963).[10]

---

[10]     Texas intermediate appellate court opinions have
employed a wide variety of language, some of it inconsistent and
much of it dicta, to describe the correct standard in this
respect.  For example, in <u>Cleburne State Bank v. Ezell</u>, 78 S.W.2d
297, 299 (Tex. Civ. App.--Waco 1934, writ dism'd), the opinion
initially states that the forbearance is sufficient consideration
"provided he in good faith and upon reasonable grounds believed
that he had such a right," but then, in upholding the jury
verdict in favor of the settlement, speaks only of good faith:
"Whether or not there was an honest assertion of a right to
recover against Ezell and whether or not the officials of the
bank in good faith believed that Ezell was liable to the bank on
the claim asserted were questions of fact to be determined by the
jury."  In both <u>Wells v. Timms</u>, 275 S.W. 468, 471 (Tex. Civ.
App.--Fort Worth 1925, writ dism'd), which sustained the
settlement, and <u>Stewart v. Friona State Bank</u>, 278 S.W.2d 425,
432-33 (Tex. Civ. App.--Amarillo 1955, writ ref'd n.r.e.), which
did not, there is language indicating that both reasonable
grounds and good faith are required, but in neither case does the
conjunctive appear to have been material to the decision.  Thus,
in <u>Stewart</u> the majority notes that "[t]here is no evidence in
this record of a bona fide dispute of any nature."  <u>Id</u>. at 432.
In <u>Wells</u> the court relied in part on a passage from a text
stating, with apparent inconsistency, that "'. . . it is not
necessary in a suit on a promise given in consideration of a
forbearance from suit that it should appear that there was . . .
a fair and reasonable ground of success in the threatened suit. .
. . It is only essential that the claim be doubtful either in law
or equity and asserted in good faith.'"  <u>Id</u>. at 471 (quoting Vol.
1 <u>Elliott on Contracts</u> at 407).
     In <u>Iden v. Ackerman</u>, 280 S.W.2d 643, 646 (Tex. Civ. App.--
Eastland 1955, writ ref'd), the court quotes with approval the
following language from 15 C.J.S. Compromise and Settlement § 11
p. 732, <u>viz</u>:
          To support a compromise it is not essential that the
     question in controversy be in fact doubtful in legal
     contemplation.  It is sufficient that there be an actual
     controversy between the parties of which the issue fairly
     may be considered by both parties as doubtful and that, at
     the time of the compromise they in good faith so consider
     it.
     <u>See</u> <u>also</u> <u>Goodwin v. Texas Employers' Ins. Ass'n</u>, 73 S.W.2d
660, 663 (Tex. Civ. App.--El Paso 1934, writ dism'd) ("The fact

17

Whether MBank honestly believed it had a right to its attorney's fees and whether the officials at the bank believed in good faith that Taylor was liable to the bank on its claim were questions of fact to be determined by the jury. <u>Cleburne State Bank</u>, 78 S.W.2d at 299. The record contains considerable evidence bearing on this issue. First, the evidence clearly shows that MBank was not subject to, nor had reasonable grounds to anticipate, rival claims to the account fund. Under the unambiguous terms of the deposit agreements, MBank owed a contractual duty only to its depositor, Suzan Taylor, not to CI. Second, MBank unreasonably delayed filing the interpleader action in order to secure its own interest in the account proceeds.

---

that it subsequently developed that the nature, character and extent of plaintiff's injury and the liability of the defendant was not in fact doubtful does not invalidate the settlement nor present any ground for setting the contract aside."); 12 Tex. Jur. 3rd Compromise and Settlement, § 6 at 269-270. In <u>Murtagh v. University Computing Company</u>, 490 F.2d 810, 815 (5th Cir. 1974), we stated, applying Texas law, that "[t]he existence of an antecedent bona fide dispute between the parties concerning the subject matter of a subsequent settlement agreement is sufficient legal consideration for creation of an enforceable agreement." The Texas Supreme Court last spoke authoritatively to this issue in <u>Hunter v. Lanius</u>, 82 Tex. 677, 18 S.W. 201 (1892). In that case, the court held that ". . . a note is supported by a sufficient consideration, if executed to secure the abandonment of a suit brought to enforce a doubtful right, or in compromise of a disputed claim made in good faith, though it ultimately appears that the claim is without merit." <u>Id</u>. at 205. Although the Texas courts have enunciated divergent opinions on this issue, we need not decide the controlling standard because there is sufficient evidence to support the findings that the bank had <u>neither</u> reasonable grounds to believe its claim was proper <u>nor</u> good faith in pursuing it, and all authorities agree that in such a situation there is no consideration.

18

Third, MBank failed to make an unconditional tender of the funds into the registry of the court and held the funds on deposit so it could exercise an assumed right of offset. Finally, MBank failed to make a good faith settlement of the interpleader after it received consistent instructions from the claimants. In light of the foregoing, it is hard to imagine how MBank could have had a reasonable belief in the validity of its claim for attorney's fees. Indeed, MBank's own lawyers testified that they advised the bank of their concern the court would be "hard-pressed" to allow the interpleader action to continue once consistent instructions were received from Taylor and CI.

As demonstrated above, substantial evidence indicates that when the release was executed MBank's claim for attorney's fees was _neither_ doubtful _nor_ asserted in good faith. Bearing in mind that all reasonable inferences from the evidence must be resolved in favor of the jury's verdict, we are satisfied there is substantial evidence from which the jury could conclude that MBank knew or should have known that it was not entitled to an award of attorney's fees from the interpleader action and did not assert such a claim in good faith. We therefore accept the jury's conclusion that the release was void for lack of consideration.[11]

---

[11]Because a release agreement may be declared invalid on any one of several grounds, we need not reach the issue of whether the release was executed under duress. _Victoria Bank & Trust Co. v. Brady_, 779 S.W.2d at 903.
    We also observe that appellants have not asserted on appeal (and apparently the bank did not assert at trial) that the dismissal judgment in the interpleader suit had a _res_ _judicata_ or

## IV. THE ACCOUNT FREEZE

The FDIC contends that even if the release was not enforceable, the "judgment . . . should be reversed because the escrow account freeze was legally justified." (Appellants' Br. at 34). In its argument, the FDIC broadly asserts that the freezing of the account was fully justified under the circumstances because the funds were deposited in an "escrow account" and were only to be disbursed in accordance with the agreement between Taylor and CI. The FDIC, however, raises this point of error without challenging any specific factual finding in the jury's verdict or indicating which of the various issues submitted was not supported by the evidence. It is established law that matters which have not been adequately briefed are precluded from consideration on appeal. In re HECI Exploration Co., Inc., 862 F.2d 513, 525 (5th Cir. 1988); Morrison v. City of Baton Rouge, 761 F.2d 242, 244 (5th Cir. 1985). The FDIC's failure to specify precisely which jury finding was in error, would, in effect, require this court to consider whether the verdict taken as a whole was supported by substantial evidence. Because such a review would be limitless, we consider the FDIC's arguments on these issues waived and decline to address them.

---

collateral estoppel effect. See, e.g., Rhoades v. Prudential Leasing Corporation, 413 S.W.2d 404, 407 (Tex. Civ. App.--Austin, 1967, no writ history) (". . . a judgment of dismissal entered by agreement of the parties in pursuance of a compromise, or settlement of a controversy, becomes a judgment on the merits"). Thus, we have no occasion to, and do not, pass on the effect of the judgment of dismissal in the interpleader suit.

See <u>Franceski v. Plaquemines Parish School Bd.</u>, 772 F.2d 197, 199 n.1 (5th Cir. 1985); <u>In re Texas Mortgage Services Corp.</u>, 761 F.2d 1068, 1073-74 (5th Cir. 1985); <u>Kemlon Products & Development Co. v. United States</u>, 646 F.2d 223, 224 (5th Cir.), <u>cert. denied</u>, 454 U.S. 863 (1981).

Even if we were to assume that the FDIC's argument was sufficiently briefed, the evidence is quite clear that MBank had no right to freeze Taylor's accounts. Taylor opened two commercial checking accounts with MBank. Under the terms and conditions of the deposit agreements, MBank and Taylor agreed that the bank would be the agent for Taylor only and would "honor any and all withdrawals" from the accounts by the authorized signatory, Suzan Taylor. Thus, MBank was bound to obey the orders of Taylor under the express terms of their contract. Moreover, under Texas law, Taylor's deposit of funds with Mbank created an implied agreement that the bank would disburse those funds only in accordance with Taylor's instructions. <u>La Sara Grain Co. v. First Nat'l Bank of Mercedes</u>, 673 S.W.2d 558, 564 (Tex. 1984), <u>citing</u> <u>Mesquite State Bank v. Professional Invest. Co.</u>, 488 S.W.2d 73, 75 (Tex. 1972). Considering the entire record of this case, particularly the initial deposit agreements which created both accounts, we are of the opinion that no "escrow account" existed and that MBank, in freezing Taylor's accounts, failed to comply with the express terms of the deposit contracts in wanton disregard of Taylor's rights.

21

In its next point of appeal, the FDIC argues there is insufficient evidence to support the jury's finding that the account freeze was a "producing cause" of Taylor's damages under the DTPA.[12] Section 17.50 of the DTPA authorizes consumers to hold sellers liable for actual damages where "a false, misleading, or deceptive act or practice" is "a producing cause" of those damages.[13] In <u>Pope v. Rollins Protective Services Co.</u>, this court noted that:

> One of the primary reasons for the enactment of the DTPA was to provide consumers with a remedy for deceptive trade practices without the burdens of proof and numerous defenses encountered in a common law fraud or breach of warranty action.[14]

Emphasizing the broad remedial purposes of the DTPA, Section 17.44 provides:

> This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

There is no dispute that Taylor was required to prove that MBank's action in freezing the accounts was a producing cause of her damages. The jury was instructed that "'producing cause'

---

[12]In Texas, when a depositor pays service fees and the bank in return agrees to honor the checks of its depositor, the depositor is a "consumer" of banking "services" within the purview of the DTPA. <u>Farmers & Merchants State Bank of Krum v. Ferguson</u>, 605 S.W.2d 320, 324 (Tex. Civ. App.--Fort Worth 1980), <u>modified</u>, 617 S.W.2d 918 (Tex. 1981). The FDIC does not dispute the applicability of the DTPA to this transaction.

[13]Tex. Bus. & Com. Code Ann. § 17.50(a)(1).

[14]703 F.2d 197 (5th Cir. 1983); <u>see</u> <u>also</u> <u>Smith v. Baldwin</u>, 611 S.W.2d 611, 616 (Tex. 1980).

means an efficient, exciting or contributing cause, which, in a natural and continuous sequence produced the damage or harm complained of, if any." While the FDIC does not challenge this jury instruction, it does contend there is insufficient evidence to support the jury's finding that MBank's actions were a producing cause of Taylor's damages. According to the FDIC, the account freeze did not cause Taylor to lose the opportunity to participate in the Comite and Santa Paula prospects since (1) payment for both prospects did not come due until after the freeze was lifted, and (2) Taylor had substantial assets which could reasonably have been used to pay for or obtain financing for the prospects during the freeze.

Shortly before drilling activities began on the Comite prospect, MBank froze Taylor's accounts. The accounts remained frozen from December 18, 1984 until April 16, 1985. According to the drilling contract, payment was due as soon as the well was drilled to a certain depth, not on the completion of a successful producing well. Thus, when it became apparent that Taylor could not resolve her dispute with MBank and obtain the needed funds in time to pay for the drilling, Taylor suspended drilling operations. The FDIC argues that even if Taylor was required to cease drilling operations, she could have obtained extensions or paid delay rentals to keep the Comite lease alive. This argument, however, ignores the undisputed fact that Taylor never intended to assume more than a 25% working interest in the Comite venture and that by the time MBank released the funds, the

23

opportunity to develop this prospect with the same working interest did not exist. Even if Taylor had wanted to continue to develop the prospect after the bank released her money, she would have been required to take a full 100% working interest in the prospect--a share that would have cost far more than the amount of funds she had on deposit at MBank.

Taylor also lost the opportunity to participate in the Santa Paula Prospect because of MBank's wrongful actions. Though Taylor briefly acquired the Santa Paula lease by assignment in February of 1985, she essentially lost the opportunity to invest in the prospect when MBank repeatedly refused payment on a $100,000 check intended to pay for her share of the lease. By the time MBank released the funds in April 1985, Taylor no longer had a co-investor to develop the Santa Paula property and therefore could not participate in the prospect with the same working interest. Based upon the evidence adduced at trial, the jury could reasonably have concluded that the account freeze was a producing cause of Taylor's loss in the Comite and Santa Paula Prospects.

The FDIC also maintains that the loss of the prospects could easily have been avoided had Taylor used her own assets, including her personal jewelry, geophysical data and cash, to either pay for or finance the drilling prospects during the freeze. This argument raises a damage question involving the doctrine of avoidable consequences. The doctrine of avoidable consequences is a fundamental rule of damages which requires the

24

injured party to take advantage of reasonable opportunities to minimize his damages and avoid or prevent loss. Gladden v. Roach, 864 F.2d 1196, 1200 (5th Cir.), cert. denied, 491 U.S. 907 (1989); Ford Motor Co. v. Dallas Power & Light Co., 499 F.2d 400, 414-15 (5th Cir. 1974); City of San Antonio v. Guidry, 801 S.W.2d 142, 151 (Tex. App.--San Antonio 1990, no writ). Texas courts have applied this rule for losses arising in actions in tort and breach of contract, as well as DTPA. Pinson v. Red Arrow Freight Lines, Inc., 801 S.W.2d 14, 15 (Tex. App.--Austin 1990, no writ); Pulaski Bank & Trust Co. v. Texas American Bank, 759 S.W.2d 723, 735 (Tex. App.--Dallas 1988, writ denied); see also Ford Motor Co., 499 F.2d at 415 n.27. Under the doctrine of avoidable consequences, an injured party with an otherwise valid cause of action who fails to mitigate his damages may not recover those damages shown to have resulted from his failure to use reasonable efforts to avoid or prevent the loss. Ford Motor Co., 499 F.2d at 415; see Pinson, 801 S.W.2d at 15; Alexander & Alexander of Texas, Inc. v. Bacchus Industries, Inc., 754 S.W.2d 252, 253 (Tex. App.--El Paso 1988, writ denied).

Although an injured party is required to use reasonable diligence to minimize his losses, he is not required to "make unreasonable personal outlays of money," Halliburton Oil Well Cementing Co. v. Millican, 171 F.2d 426, 430 (5th Cir. 1948), or to "sacrifice a substantial right of his own." Fidelity & Deposit Co. of Maryland v. Stool, 607 S.W.2d 17, 25 (Tex. Civ. App.--Tyler 1980, no writ). Rather, an injured party is required

25

to incur "only slight expense and reasonable effort" in mitigating his damages. City of San Antonio, 801 S.W.2d at 151 (quoting Pulaski Bank & Trust Co., 759 S.W.2d at 735). One who claims a failure to mitigate damages has the burden to prove not only lack of diligence on the part of injured party, but also the amount by which damages were increased by such failure to mitigate. Lakeway Land Co. v. Kizer, 796 S.W.2d 820, 824 (Tex. App.--Austin 1990, writ denied); Geotech Energy Corp. v. Gulf States Telecommunications & Info. Sys., Inc., 788 S.W.2d 386, 390 (Tex. App.--Houston [14th Dist.] 1990, no writ); Cocke v. White, 697 S.W.2d 739, 744 (Tex. App.--Corpus Christi 1985, writ ref'd n.r.e.).

We conclude that MBank's proof failed to meet these requirements. The FDIC asserts that Taylor had substantial sums readily available to maintain these prospects. The undisputed testimony at trial, however, makes clear that a substantial portion of Taylor's money was already committed to pay for her company's payroll of some fifty employees, office space and general business expenses. In addition, during the period of time the Comite drilling operation was shut down because of the account freeze, Taylor was required to pay sizable day rates to the drilling contractor while the rig was on standby. As for the FDIC's contention that Taylor could sell her jewelry or cars to fund the drilling prospects, we find this completely without merit. In taking reasonable efforts to minimize her losses, Taylor was not obligated to sell or encumber her own personal

26

property in order to maintain these drilling prospects during the freeze. Halliburton, 171 F.2d 426, 430; Pulaski Bank & Trust Co., 759 S.W.2d at 735; Fidelity & Deposit Co., 607 S.W.2d 17, 25. Because MBank offered no evidence that Taylor failed to make reasonable efforts to minimize her losses and because MBank failed to prove the amount by which damages were increased, the trial court properly refused to instruct the jury on this issue.

The FDIC also challenges the jury instructions because the state trial court refused to submit to the jury MBank's defensive issues relating to the release, including ratification, waiver, estoppel, and accord and satisfaction. A trial court has broad discretion in composing a charge for the jury so long as the instructions are fundamentally accurate and not misleading. Landrum v. Goddard, 921 F.2d 61, 62 (5th Cir. 1991) (citing Gates v. Northwest Ins. Co., 881 F.2d 215 (5th Cir. 1989)), cert. denied, 494 U.S. 1017 (1990). "The instructions need not be perfect in every respect provided that the charge in general correctly instructs the jury, and any injury resulting from the erroneous instruction is harmless." Rogers v. Eagle Offshore Drilling Servs., Inc., 764 F.2d 300, 303 (5th Cir. 1985). In the present appeal, the FDIC has not cited, nor do we find, evidence in the record to justify the requested instructions. Even if we were to assume MBank presented sufficient evidence to warrant the requested instructions, we conclude that the jury instructions taken as a whole correctly instructed the jury on controlling law and were fundamentally accurate and not misleading. Migerobe,

27

<u>Inc. v. Certina USA, Inc.</u>, 924 F.2d 1330, 1335 (5th Cir. 1991);

<u>Landrum</u>, 921 F.2d at 62.

### V. THE "DEMAND" PROVISIONS

MBank was also found liable for its failure to act in good faith when it accelerated the Jaguar and yacht loans. It is undisputed that immediately after the interpleader action was settled, MBank demanded full payment on all four of Taylor's outstanding loans even though she was current on both the Jaguar and yacht notes. At trial, MBank offered no evidence that Taylor was in default of any provision of these two loan agreements or that her payments on the secured loans were delinquent or past due. Instead, MBank argued unsuccessfully that because these promissory notes were demand notes, that it could demand payment at any time with or without reason.

The FDIC, on appeal, raises a similar contention and urges us to reverse the damage award on the basis the trial court erroneously submitted an instruction on "good faith."[15] In

---

[15]This instruction provided as follows:
Special Issue No. 7
     Do you find from a preponderance of the evidence that MBank failed to act in good faith in connection with its banking transactions with Taylor?

     Answer "yes" or "no" to (a) and (b):

     (a)  Comite accounts:  <u>Yes</u>
     (b)  Acceleration of the Jaguar and boat loans:  <u>Yes</u>

     You are instructed that "good faith" means honesty in fact in the conduct or transaction concerned. The test for good faith is the actual belief of the party in question and not the reasonableness of that belief. You are also instructed that in order to find that MBank breached a duty to act in good faith you must

28

support of this argument, the FDIC relies upon the good faith provisions of the Tex. Bus. & Com. Code Ann. § 1.208 (Vernon 1968), as interpreted by the Official Comment to that section. Section 1.208, which governs the application of the "good faith" requirement to acceleration clauses, states that a term providing that one party may accelerate payment at will or when he deems himself insecure "shall be construed to mean that he shall have the power to do so only if he in good faith believes that the prospect of payment or performance is impaired."  The Official Comment to section 1.208 notes the following exception:

> Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason.

We begin, therefore, with an examination of the loan documents to determine whether they clearly gave MBank complete discretion to demand payment at any time with or without cause. Taylor executed two promissory notes in favor of MBank for the purchase of a Jaguar automobile and a Sea Ray yacht.  Except for the installment payment amounts and maturity date, the two promissory notes contain virtually identical provisions.  Each note contains a monthly payment schedule, an acceleration clause and a demand clause.  The demand clause states that "this obligation is, as an alternative to the above-recited payment schedule, due and payable on demand."  A similar demand provision is recited on the reverse side of the note.  The notes also

---

find that the failure or failures to act in good faith, if any, were the natural, probable and foreseeable consequences of MBank's actions.

29

contain an acceleration clause.  Under the acceleration clause, the bank is entitled, at its option, to accelerate the unpaid principal balance and accrued interest "if default occurs in the punctual payment of any installment of principal or interest, . . . or upon the occurrence of a default under the terms of any and all agreements or instruments securing . . . the indebtedness, or if at any time the [bank] . . . deems itself insecure."  In addition to the default provisions contained in the acceleration clause, the bank's security agreements and mortgage securing the debt list various "events of default" which could result in the bank declaring the entire obligation immediately due and payable.

The FDIC argues that the demand feature permitted MBank to demand payment at any time with or without reason.  The only Texas case cited by the FDIC on this point is Conte v. Greater Houston Bank, 641 S.W.2d 411 (Tex. App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.).  In Conte, the court was faced with a promissory note which provided that payment was due "ON DEMAND, BUT IF NO DEMAND IS MADE:  principal and interest shall be due and payable in monthly installments . . . ."  Id. at 412.  The maker of the note argued that since the bank accepted monthly installment payments without demanding payment before they were due, the bank no longer retained the right to make a demand under the demand clause.  The court rejected this argument stating that "it was proper to construe the note 'payable, at the convenience of the holder, either on demand or in installments . . . .'"  Id.

30

at 418, quoting C & Z, Inc. v. Oklahoma Tax Comm'n, 459 P.2d 601 (Okl. 1969).

Despite some similarity between Conte and the present case, there are important differences. Unlike the present situation, there is no indication that the note in Conte contained an acceleration clause. It also does not appear that the note was accompanied by an underlying security agreement or included terms which would modify the right of demand. Here, in contrast, the existence of explicit conditions of default in the acceleration clause, as well as the related security agreements, shows a clear intention that the note be payable on demand only in the event Taylor failed to meet the installment obligations or the obligations imposed by the security agreements. In construing a similar loan agreement, the court in Reid v. Key Bank of Southern Maine, Inc., 821 F.2d 9, 14 (1st Cir. 1987) noted that:

> The presence of such conditions in both documents indicates that the agreement could not simply be terminated at the whim of the parties; rather, the right of termination was subjected to various limitations. The detailed enumeration of events that would "render" the note "payable on demand," or which would put Reid in "default," shows the qualified and relative nature of any "demand" provision.

As applied to the facts of this case, we find the Reid decision persuasive. Demand instruments, by definition, are payable on demand and are considered due immediately when executed. Leinen v. Buffington's Bayou City Service, Co., 824 S.W.2d 682, 684 (Tex. App.--Houston [14th Dist.] 1992, no writ); Davis v. Dennis, 448 S.W.2d 495, 497 (Tex. Civ. App.--Tyler 1969, no writ). If a demand obligation was indeed intended, as

31

suggested by the FDIC, the conditions for acceleration stated in MBank's agreements with Taylor would be meaningless.  The bank could simply demand payment immediately regardless of whether any of the specified default conditions occurred.  This does not appear to be the reasonable intent and expectations of the parties.  In fact, the former president of MBank, Ed Evans, testified at trial that the bank could not simply demand payment on an "unreasonable basis," but was obligated to consider, in good faith, all the facts and circumstances before accelerating the note.

Based upon the testimony and our reading of the loan documents, we determine that although these notes profess to be demand instruments, a fair reading of the notes and related security agreements demonstrates an intention that these installment notes be payable on demand only in the event of default.  This construction comports with the common expectation that a promissory note with an installment feature and an acceleration clause is a time obligation and that the bank does not have the right to demand payment in absence of default.

For the reasons stated, we find under the facts of this case that the trial court's instruction on "good faith" was proper.

## VI.  THE YACHT FORECLOSURE

The FDIC argues that the pendency of the maritime action in federal court precluded recovery on Taylor's claim for bad faith foreclosure because such a claim was a compulsory counterclaim

32

under the Fed. R. Civ. P. Rule 13(a).  Taylor, however, plead
this counterclaim in both the federal and state court actions.
Because the state action was tried first, Taylor's counterclaim
was never adjudicated in the federal court action.  Therefore,
contrary to the FDIC's assertions, Taylor never waived this
claim, and it was properly considered in the state action.  <u>See</u>
<u>Southern Constr. Co., Inc. v. Pickard</u>, 371 U.S. 57, 60-61 (1962).

## VII. PUNITIVE DAMAGES

The district court awarded Taylor $5.2 million in punitive
damages and additional damages under section 17.50(b)(1) of the
DTPA.[16]  The FDIC maintains that because the FDIC is an
instrumentality of the United States, sovereign immunity requires
a reversal of that award.  Taylor does not dispute that the FDIC
is immune from suit, but argues that the FDIC, as the receiver of
MBank, should not be permitted to assert new defenses unique to
its status when it intervenes post-judgment.

Before considering the merits of these arguments, we briefly
review the procedural posture in which this issue is presented to
us on appeal.  MBank raised the issue of punitive damages for the
first time in its motion for new trial and motion to modify,
correct, or reform the judgment filed within 30 days after
judgment was entered in state court.  These motions were later
adopted by the FDIC when it intervened in the state court action,
and presented to the district judge once the case was removed to

---

[16]Treble damages under the DTPA are punitive in nature under
Texas law.  <u>Pace v. State</u>, 650 S.W.2d 64, 65 (Tex. 1983).

33

federal court. Following removal, the state court motion to modify, correct, or reform the judgment was reformed by the parties to comply with the federal rules and was considered by the district court as a Rule 59(e) motion to alter or amend judgment. The district court later denied both the Rule 59(e) motion and the motion for new trial. We emphasize the fact that the FDIC raised the punitive damage issue in the district court while that court still had under consideration the timely filed motion for new trial and to alter or amend judgment filed by MBank. Because the motions were filed before the time for filing a notice of appeal had expired, the issue was raised in the trial court when there was no final unappealable judgment.[17]

Turning to the merits of the case, the question we are asked to decide is whether the FDIC, as a post-judgment intervenor, can assert sovereign immunity as a defense for the first time in a Rule 60(b) motion before the judgment in the district court becomes final and unappealable.[18] Sovereign immunity is a

---

[17]A remarkably different situation would have been presented had the FDIC filed its motions after the judgment had become final and unappealable. See 12 U.S.C. § 1821(d)(13)(A) ("The Corporation shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the Corporation as conservator or receiver").

[18]The FDIC's assertion of its immunity defense presented in its motion to alter or amend judgment is properly treated as a Rule 60(b) motion for relief from judgment since it was made more than ten days after the entry of judgment. Laverspere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 173 (5th Cir. 1990). Such a motion is addressed to the sound discretion of the trial court and will not be overturned unless there is a showing of an abuse of that discretion. Williams v. Brown & Root, Inc., 828 F.2d 325, 328 (5th Cir. 1987); Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 402 (5th Cir. 1981).

jurisdictional bar to those suits "that are prosecuted against the United States." Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 412 (1821). Even if the United States was not named as a party in the original action, "'if the judgment sought would expend itself upon the public treasury or domain, or interfere with public administration,'. . . or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act . . . ,'" the suit will be construed as one against the United States requiring a waiver of sovereign immunity. Dugan v. Rank, 372 U.S. 609, 620 (1963) (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704 (1949); Land v. Dollar, 330 U.S. 731, 738 (1947)); Van Drasek v. Lehman, 762 F.2d 1065, 1069 (D.C. Cir. 1985); see also Alabama Rural Fire Ins. Co. v. Naylor, 530 F.2d 1221, 1225 (5th Cir. 1976). "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. at 538 (quoting Unites States v. King, 395 U.S. 1, 4 (1969)). Where no such consent exists, sovereign immunity operates as a jurisdictional bar. United States v. Mitchell, 445 U.S. at 538; Stanley v. Central Intelligence Agency, 639 F.2d 1146, 1156 (5th Cir. 1981).

It is established law that agencies of the United States cannot be held liable for punitive fines or assessments absent express Congressional authorization. Missouri Pac. R.R. v. Ault, 256 U.S. 554, 563-65 (1921); Commerce Federal Sav. Bank v. Federal Deposit Ins. Corp., 872 F.2d 1240, 1247-48 (6th Cir. 1989); Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n, 885

35

F.2d 266, 273 (5th Cir. 1989); <u>Painter v. Tennessee Valley Authority</u>, 476 F.2d 943, 944 (5th Cir. 1973).  Taylor does not dispute that the FDIC is an instrumentality of the United States, see <u>Commerce Federal Sav. Bank v. Federal Deposit Ins. Corp.</u>, 872 F.2d at 1248, nor does she cite any express Congressional authority permitting the imposition of punitive fines or penalties against the FDIC.  She merely contends that the FDIC cannot assert its sovereign immunity defense for the first time when it intervenes after judgment.

In support of her contention, Taylor relies on <u>Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n</u>, 885 F.2d 266 (5th Cir. 1989).  In <u>Olney</u>, Olney Savings sued Trinity Banc and its related mortgage company seeking rescission of their agreement to finance the purchase of certain townhouses.  The district court entered judgment of rescission on the jury's finding of fraud.  Trinity Banc and the mortgage company posted a supersedeas bond to stay execution of the judgment and perfected their appeal.  While the case was on appeal, FSLIC was appointed conservator of the insolvent Trinity Banc.  Relying on <u>Grubb v. Federal Deposit Ins. Corp.</u>, 833 F.2d 222 (10th Cir. 1987), this court held that when the bond was posted by Trinity Banc and the mortgage company, the funds ceased to be assets of the insolvent institutions, and therefore were not a part of the conservatorship estate.  Because the bond was no longer an asset available to the FSLIC for distribution, we said "its use as punitive damages does not tax an agency of the United States nor offend sovereign immunity."

Olney, 885 F.2d at 274.  In this case, however, no supersedeas bond was posted from which the punitive damage award could be satisfied.  The punitive damages would therefore be drawn from assets available for distribution by the receiver and would not only "interfere with the public administration" of the assets of the receivership estate, but would likely "expend itself on the public treasury" by increasing the loss to the insurance fund.  Dugan, 372 U.S. at 620; Federal Deposit Ins. Corp. v. Claycomb, 945 F.2d 853, 861 (5th Cir. 1991).  Because Taylor has failed to indicate how the punitive damage award could be secured without affecting the receivership estate, we find the Olney decision inapplicable to the present circumstances.

We likewise reject Taylor's argument that sovereign immunity cannot be raised by the FDIC post-judgment.  Sovereign immunity is a jurisdictional prerequisite which may be asserted at any stage of the proceedings, either by the parties or by the court on its own motion.  See, e.g., United States v. Sherwood, 312 U.S. 584, 586-87 (1941); Ramey Constr. Co. v. Apache Tribe of Mescalero Reserv., 673 F.2d 315, 318 (10th Cir. 1982); California v. Quechan Tribe of Indians, 595 F.2d 1153, 1154 n.1 (9th Cir. 1979); 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3654, at 186-90 (1985).  Here, the FDIC asserted its sovereign immunity defense in the district court before a final unappealable judgment had been taken, and therefore properly raised and preserved the question of sovereign immunity for the court's consideration.  Inasmuch as the punitive damages would

37

operate against the United States, and there being no express Congressional waiver of sovereign immunity, we conclude that the district court abused its discretion in denying the FDIC's motion for relief from judgment on this issue.

### VIII.   DUPLICATIVE DAMAGES

Next, the FDIC complains that the judgment should be vacated to remove duplicative damage awards for the loss of the drilling prospects as well as the wrongful acceleration of the car and yacht notes.  The jury answered seven special issues submitted on actual damages.  In rendering its verdict, the jury found MBank liable for (1) $350,000 in actual damages for each of the two DTPA violations; (2) $300,000 in actual damages for the bank's failure to act in good faith in reference to the Comite accounts; (3) $75,000 in actual damages for the bank's failure to act in good faith in accelerating the Jaguar and yacht loans; (4) $1,000,000 in actual damages for tortiously interfering in the business affairs of Taylor; (5) $10,000 in actual damages for converting Taylor's personal property from the yacht; and (6) $500,000 in actual damages for conspiracy.

In its brief, the FDIC makes a generalized allegation that these damage awards amount to a double recovery.  While we agree that a party "cannot recover the same damages twice, even though the recovery is based on two different theories," Atkinson v. Anadarko Bank & Trust Co., 808 F.2d 438, 441 (5th Cir.), cert. denied, 483 U.S. 1032 (1987), the FDIC fails to identify which of the various damage awards involved amount to identical damage

38

awards or even discuss the pertinent case law concerning this issue. Instead, the FDIC simply proclaims, without explanation, that the "judgment for loss of the drilling prospects should be limited to one award of $300,000 . . . ." (Appellants' Br. at 41). To decide whether the jury erroneously awarded double damages would require us not only to speculate which damage award the FDIC claims to be duplicative, but also to determine whether the jury intended to make separate and distinct findings for each act or omission and, if not, to elect the recovery which affords the greater recovery. We decline to address these points without the benefit of full and complete briefing of the issues and therefore consider the FDIC's duplicative damage argument waived. In re HECI Exploration Co., Inc., 862 F.2d at 525; Morrison v. City of Baton Rouge, 761 F.2d at 244.

IX. NEW TRIAL

The FDIC finally argues that the district court erred in denying its motion for new trial, alleging that the jury verdict was against the great weight of the evidence. The decision whether to grant or deny a motion for new trial is within the sound discretion of the district court. Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 164 (5th Cir. 1990); Hansen v. Johns-Manville Products Corp., 734 F.2d 1036, 1043 (5th Cir. 1984), cert. denied, 470 U.S. 1051 (1985). As an appellate court, we review the exercise of that discretion under an abuse of discretion standard and will overturn a district court's denial of a motion for new trial only if there is an "'absolute

39

absence of evidence to support the jury's verdict.'"  <u>Seidman v. American Airlines, Inc.</u>, 923 F.2d 1134, 1140 (5th Cir. 1991) (citing <u>Cobb v. Rowan Companies, Inc.</u>, 919 F.2d 1089, 1090 (5th Cir. 1991)).  As discussed in the preceding sections of our opinion, the record clearly contains evidence to support the jury verdict.  We therefore affirm the trial court's denial of the plaintiff's motion for new trial.

## X.   ATTORNEY'S FEES

Bank One, successor-in-interest to MBank, claims it is entitled to recover attorney's fees for MBank's collection of the $90,000 and $50,000 notes which Taylor admitted she owed.  Under Texas law, a party is permitted to recover attorney's fees only if they are authorized by contract or by statute.  <u>New Amsterdam Casualty Co. v. Texas Indus., Inc.</u>, 414 S.W.2d 914, 915 (Tex. 1967); <u>4M Linen & Uniform Supply Co., Inc. v. W.P. Ballard & Co., Inc.</u>, 793 S.W.2d 320, 327 (Tex. App.--Houston [1st Dist.] 1990, no writ).  In its petition, MBank did not plead that it was entitled to recover attorney's fees under any Texas statute.  Rather, it relied on the contractual language of the promissory notes as a basis for recovery.  At the conclusion of the trial, the state court denied MBank's requested offset to the judgment in the amount of $76,748.50, representing MBank's claim for attorney's fees on the $90,000 and $50,000 notes.  Bank One maintains that the state court's denial of the entirety of MBank's attorney's fees was in error.  Taylor apparently concedes this point, but argues that since the bank failed to check a box

40

on the face of the $90,000 note allowing for the collection of attorney's fees, Bank One's claim for attorney's fees should be properly apportioned between the two notes.  We agree.  Ordinarily, where a case involves more than one claim, attorney's fees can be awarded only for necessary legal expenses incurred in connection with the claims for which recovery is authorized.  Ralston Oil and Gas Co. v. Gensco, Inc., 706 F.2d 685, 697 (5th Cir. 1983); International Security Life Ins. Co. v. Finck, 496 S.W.2d 544, 546-47 (Tex. 1973).  We therefore remand this claim to the trial court for hearing to determine the amount of attorney's fees, if any, recoverable for services rendered to collect the unpaid balance of the $50,000 promissory note.

CONCLUSION

The jury correctly found that MBank did not give valid consideration for the release.  MBank's claim for attorney's fees for institution of the interpleader action was not made in good faith, and MBank knew or should have known that the claim was without foundation.  There is also ample evidence to support the jury's determination that the account freeze was a producing cause of Taylor's loss in the two drilling prospects.

With respect to the two promissory notes, we hold that MBank had the right to demand payment only if the bank believed in good faith that the prospect of payment or performance was impaired.  Taylor, however, is not entitled to an award of punitive damages because the FDIC, as an agency of the United States, is immune from such damages.  We, therefore, AFFIRM the judgment of the

41

district court to the extent it upheld the findings of the jury, but REVERSE the judgment of the district court to the extent it granted recovery against the FDIC for punitive damages.  We REMAND to the district court for the limited purpose of issuing a final judgment, including interest and costs, and, if proper, attorney's fees consistent herewith.

SO ORDERED.